UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> M&D ELITE PHARMACY, LLC, TIME TO CARE PHARMACY INC., FIRST CLASS PHARMACY CORP, MARAT ZAGORIN, DANIEL STARCHAK, MICHAEL TABULOV, AND VYACHESLAV GIRENKO, <br><br> Defendants. | No. |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.    INTRODUCTION

1.      M&D Elite Pharmacy, LLC ("M&D"), Time to Care Pharmacy Inc. ("TTC"), and First Class Pharmacy Corp ("First Class") (collectively, "Pharmacy Defendants") and their owners—Marat Zagorin ("Zagorin"), Daniel Starchak ("Starchak"), Michael Tabulov ("Tabulov"), and Vyacheslav Girenko ("Girenko") (collectively, "Defendants")—damaged

1

Allstate by submitting fraudulent claims seeking payment for topical pain-relief products, including diclofenac sodium gel, lidocaine ointment, and lidocaine patches ("Topical Pain Products").

2.      The Defendants submitted the Pharmacy Defendants' claims to Allstate under New York's No-Fault laws, which provide insurance coverage to persons ("claimants") involved in automobile accidents.  New York was an ideal venue for this scheme because claimants are eligible for at least $50,000.00 in coverage for necessary medical and pharmacy expenses, and because claimants can assign their No-Fault benefits to pharmacies; in turn, pharmacies can seek payment directly from the claimant's insurer, which removes claimants from the billing process and keeps them ignorant about the cost of their care.

3.      The claims submitted by the Defendants were fraudulent because the Pharmacy Defendants were not eligible to collect payments under New York's No-Fault laws.

4.      In New York, pharmacies are not eligible to collect No-Fault payments if they fail to comply with applicable licensing requirements.

5.      Pharmacies are prohibited from billing for unnecessary drugs or participating in unlawful referral arrangements.  Here, the Pharmacy Defendants billed Allstate for Topical Pain Products that were medically unnecessary—the claimants did not need the Topical Pain Products, and the drugs were ineffective to treat musculoskeletal conditions.

6.      Pharmacies must also comply with a specific schedule of fees when submitting No-Fault claims because pharmacy claims are paid using rates that are calculated based on the drug's average wholesale price—a rate that is often many times greater than a drug's actual acquisition cost.

7.      The Defendants purposely targeted the Topical Pain Products because the drugs could be acquired at a low cost and then charged at a high price.

8.      The Defendants secured a steady stream of prescriptions for these drugs because of unlawful referral arrangements they had with the prescribers, which violated New York law. The Topical Pain Products were ordered for claimants as part of fraudulent predetermined treatment protocols, which required prescriptions for all claimants regardless of medical need. Numerous prescriptions were generated by clinics that specifically catered to No-Fault patients. Several of these clinics have been implicated in fraud schemes in other actions filed in this District.  The prescriptions were steered to the Pharmacy Defendants so the Defendants could bill Allstate.

9.      The Defendants enriched themselves at the expense of patients because the Topical Pain Products were prescribed and dispensed indiscriminately, without regard for actual medical need.  Indeed, the scheme generated vast numbers of prescriptions for the Pharmacy Defendants, which placed patients at risk.

10.     Overall, the Pharmacy Defendants operated in violation of New York law by dispensing and billing for medically unnecessary, unneeded, and excessively charged drugs prescribed by corrupt providers.

11.     The Defendants knew that the Pharmacy Defendants were ineligible to collect No-Fault payments, yet they still created statutory claim forms (i.e., NF-3 bills), which falsely certified the Pharmacy Defendants' eligibility to collect No-Fault payments under New York law.

12.    Allstate reasonably relied on the facial validity of the records and bills mailed by the Pharmacy Defendants —and the representations contained therein—when making payments on the Pharmacy Defendants' No-Fault claims.

13.    The Defendants knew that the Pharmacy Defendants' No-Fault claims were false and fraudulent because the bills and documents submitted to Allstate in support of the claims misrepresented or omitted material facts about the Pharmacy Defendants' rights to be paid under New York's No-Fault laws.

14.    The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim documents warranting the PC Defendants' eligibility to collect No-Fault payments under New York law.

15.    Allstate reasonably relied on the facial validity of the records and bills mailed by the Pharmacy Defendants—and the representations contained therein—when making payments on the Pharmacy Defendants' No-Fault claims.

16.    By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

17.    This action seeks actual damages in excess of $941,200.00, which represent No-Fault payments that Allstate was wrongfully induced to make to the Pharmacy Defendants during the course of this scheme.

18.    Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to M&D, TTC, or First Class, or any of their agents in connection with any No-Fault claims submitted to Allstate.

19.    All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

20.    The Defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to the Pharmacy Defendants for the benefit of the Defendants.

21.    In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for medical services that were not compensable under New York's No-Fault laws.

22.    The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

23.    Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of the Pharmacy Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II.    PARTIES

### A.    PLAINTIFFS

24.    Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

25.    At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity

Company, and Allstate Fire & Casualty Insurance Company were authorized to conduct business in New York.

      **B.**     <u>DEFENDANTS</u>

        **1.**     <u>**M&D Elite Pharmacy LLC**</u>

26.     M&D is a limited liability corporation organized under New York law.  M&D is an enterprise whose activities affect interstate commerce.

27.     M&D's principal place of business is 239-19 Braddock Avenue in Bellerose, New York.

28.     M&D is owned by Zagorin and Starchak.

29.     Zagorin, Starchak, TTC, and Tabulov participated in the operation of M&D.

30.     M&D billed for pharmacy services in connection with Allstate claimants.

31.     M&D knowingly submitted fraudulent claims to Allstate.  M&D's claims are fraudulent because the billed-for drugs were unnecessary and ordered pursuant to predetermined protocols and prohibited referral arrangements.

32.     Accordingly, M&D was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

        **2.**     <u>**Time to Care Pharmacy Inc.**</u>

33.     TTC is a corporation organized under New York law.  TTC is an enterprise whose activities affect interstate commerce.

34.     TTC's principal place of business is 248-47 Jericho Turnpike in Bellerose, New York.

35.     TTC is owned by Tabulov.

36.     Tabulov, M&D, Zagorin, Starchak, First Class, and Girenko participated in the operation of TTC.

37.     TTC billed for pharmacy services in connection with Allstate claimants.

38.     TTC knowingly submitted fraudulent claims to Allstate. TTC's claims are fraudulent because the billed-for drugs were unnecessary and ordered pursuant to predetermined protocols and prohibited referral arrangements.

39.     Accordingly, TTC was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

3.     **First Class Pharmacy Corp**

40.     First Class is a corporation organized under New York law. First Class is an enterprise whose activities affect interstate commerce.

41.     First Class's principal place of business is 248-47 Jericho Turnpike in Bellerose New York.

42.     First Class is owned by Girenko.

43.     Girenko, TTC, and Tabulov participated in the operation of First Class.

44.     First Class billed for pharmacy services in connection with Allstate claimants.

45.     First Class knowingly submitted fraudulent claims to Allstate. First Class's claims are fraudulent because the billed-for drugs were unnecessary and ordered pursuant to predetermined protocols and prohibited referral arrangements.

46.     Accordingly, First Class was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

4.     **Marat Zagorin**

47.     Zagorin resides in and is a citizen of the State of New York.

48.     Zagorin is not a licensed pharmacist, and Zagorin is not authorized to practice pharmacy in the State of New York.

49.     Zagorin owns M&D and is associated with TTC.

50.     Zagorin participated in the operation and management of the M&D and TTC enterprises during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 5.    Daniel Starchak

51.     Starchak resides in and is a citizen of the State of New Jersey.

52.     Starchak is not a licensed pharmacist, and Starchak is not authorized to practice pharmacy in the State of New York.

53.     Starchak owns M&D and is associated with TTC.

54.     Starchak participated in the operation and management of the M&D and TTC enterprises during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 6.    Michael Tabulov

55.     Tabulov resides in and is a citizen of the State of New York.

56.     Tabulov is not a licensed pharmacist, and Tabulov is not authorized to practice pharmacy in the State of New York.

57.     Tabulov owns TTC and is associated with M&D and First Class.

58.     Tabulov participated in the operation and management of the M&D, TTC, and First Class enterprises during the relevant period, and is therefore responsible for the fraudulent

and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

### 7.    **Vyacheslav Girenko**

59.    Girenko resides in and is a citizen of the State of New York.

60.    Girenko is not a licensed pharmacist, and Girenko is not authorized to practice pharmacy in the State of New York.

61.    Girenko owns First Class and is associated with TTC.

62.    Girenko participated in the operation and management of the First Class and TTC enterprises during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy services billed in connection with the claimants at issue in this Complaint.

## III.    **JURISDICTION AND VENUE**

63.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

64.    Supplemental jurisdiction over the Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

65.    Venue is proper under 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

66.    At all relevant times, the Defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

67.    The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

68. As the allegations and causes of action in the within Complaint arise from (a) the Defendants' unlawful acts committed in the State of New York, and (b) the fraudulent and non-compensable billing that Defendants generated and submitted from within the State of New York seeking payment under New York's No-Fault laws, there is no question that there exists a substantial relationship between the transactions at issue and Allstate's causes of action.

## IV.    APPLICABLE LAW

### A.    GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

69. Allstate underwrites automobile insurance in the State of New York.

70. New York's No-Fault laws are designed to ensure that injured victims of automobile accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services, including prescription drugs.

71. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

72. Under New York's No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of an automobile.

73. "Basic economic loss" is defined to include "all necessary expenses" for prescription drug services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

74. No-Fault benefits include at least $50,000.00 per Allstate claimant for necessary expenses that are incurred for healthcare goods and services, including prescription drugs.

B.    ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS

75.    Pharmacies are not eligible to collect payment under New York's No-Fault laws if they fail "to meet **any** applicable New York State or local licensing requirements necessary to perform" pharmacy services in New York. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

76.    New York's Education Law applies to pharmacies. *See* N.Y. Educ. Law § 6800, *et seq.* Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

### 1.    Duties of Pharmacies and Their Owners

77.    Pharmacy owners and supervising pharmacists "shall be responsible for the proper conduct of [the] pharmacy." N.Y. Educ. Law § 6808(2)(e).

78.    "No pharmacist shall have personal supervision of more than one pharmacy at the same time." *Id.*

79.    Only a licensed pharmacist or pharmacy intern may perform professional pharmacy services. *See* 8 N.Y.C.R.R. § 63.6; 8 N.Y.C.R.R. § 29.7(21).

80.    Pursuant to 8 N.Y.C.R.R. § 63.6(b)(7), pharmacists "shall conduct a prospective drug review before each prescription is dispensed or delivered to the patient," which "review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

81.    A pharmacist can refuse to dispense a prescription "if, in his or her professional judgment, potential adverse effects, interactions or other therapeutic complications could endanger the health of the patient." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(e), § 63.6(b)(8)(ii)(d)(5).

82.    Before drugs can be delivered to new patients on the pharmacy's premises, the pharmacist must personally counsel the patient by telephone or in person on appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications.  8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)-(b).  The same rules apply when new drugs are delivered to existing patients. *Id.*

83.    When drugs are delivered to patients off-premises, the pharmacist must "include with each prescription a written offer to counsel the patient" regarding the drug or medication, including its "known indications" and "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered."  8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)(1), (4) and § 63.6(b)(8)(ii)(a).  The written offer of counseling "shall provide a telephone number at which a licensed pharmacist or pharmacy intern may be readily reached." *Id*.  If a pharmacist or pharmacy intern determines that the prescription(s) present "potential drug therapy problems which could endanger the health of the patient," such as "therapeutic duplications, drug-drug interactions and drug-allergy interactions," then the pharmacist "shall personally contact the patient" either by phone or in person to "offer counseling on the identified potential drug therapy problems" and other issues that the pharmacist deems appropriate in their judgment.  8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(1).

84.    The responsibility of offering counseling to patients in these situations "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit."  8 N.Y.C.R.R. § 68.6(b)(8)(ii)(d)(2).

85.    If the patient refuses to accept counseling, such refusal must be documented.  8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

86.    Unlicensed persons are not authorized to perform functions requiring professional judgment, and thus cannot "interpret and evaluate a prescription for conformance with legal requirements, authenticity, accuracy and interaction of the prescribed drug with other known prescribed and over-the-counter drugs," cannot "sign or initial any record of dispensing required to be maintained by law," and cannot "counsel patients."  8 N.Y.C.R.R. § 29.7(21)(ii)(b)(1), (2), (6), (7).  Aiding and abetting an unlicensed person to practice a profession, including pharmacy, is considered a crime.  N.Y. Educ. Law § 6512.

### 2.    Prohibited Referrals

87.    New York law prohibits registered pharmacies from exploiting patients for financial gain. 8 N.Y.C.R.R. § 29.1(b)(2) (prohibiting registered pharmacies from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party").

88.    New York law prohibits registered pharmacies from engaging in unlawful referral relationships. *Id.* at § 29.1(b)(3) (prohibiting registered pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.").

89.    New York Education Law § 6509-a prohibits pharmacists from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of fees for pharmacy or medical services.

90.     Providers are prohibited from making referrals to pharmacies when a financial relationship exists.  *See* N.Y. Pub. Health Law § 238-a.  Prohibited relationships include kickbacks and compensation agreements that vary directly or indirectly based on the volume or value of any referrals or business between the parties.  *Id.* § 238-a(1), (5); *see also* N.Y. Educ. Law § 6530(18) (defining professional misconduct of physicians and physician assistants to include "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services"); N.Y. Educ. Law § 6530(38) (defining professional misconduct of physicians and physician assistants to include "[e]ntering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions").  It is also a crime for "[a]ny person to enter into an agreement with a physician…for the compounding or dispensing of secret formula (coded) prescriptions." N.Y. Educ. Law § 6811.

### 3.    Electronic Prescription Mandate

91.     As of March 27, 2016, New York law requires electronic prescriptions for both controlled and non-controlled substances.  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

92.     The electronic prescription mandate was intended to reduce prescription drug fraud and misuse.  *See* N.Y. Senate Bill S7637 (2011-2012 Leg. Session) (explaining how "E-prescribing is a secure method of transmitting prescriptions from practitioners to pharmacists. Since an e-prescription cannot be physically altered, forged, or stolen …, it curtails prescription fraud.").

93.    There are few exceptions to the electronic prescription mandate, such as when electronic prescribing is not available due to temporary technological or electrical failure, where the prescribing provider has obtained a waiver, or where drugs cannot be prescribed electronically in a timely manner (and such delay would adversely impact the patient's medical condition).  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

94.    If a prescription is not issued electronically, then the prescribing provider must indicate in the patient's health record the reason that the prescription was not issued electronically.  N.Y. Educ. Law § 6810(11)-(12).  The prescriptions must be issued using an Official New York State Prescription Form or an oral prescription in accordance with New York law.  *Id*.

95.    All drugs must be prescribed electronically, absent one of these limited exceptions.

96.    Even where an exception applies, the use of pre-printed forms identifying multiple predetermined drugs from which providers can select violates New York Education Law § 6810(7)(a).  *See* N.Y. Educ. Law § 6810(7)(a) ("No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug.  No drug shall be dispensed by a pharmacist when such prescription form includes any other drug.").

C.    CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS

97.    Claimants can assign their No-Fault benefits directly to pharmacies.

98.    Under a duly executed assignment, a claimant's pharmacy may submit claims directly to an insurance company and receive payment for necessary pharmacy services rendered. 11 N.Y.C.R.R. § 65.3-11(a).

99.     Pharmacies can submit claims using the claim form required by the New York State Department of Financial Services f/k/a New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3 form"). 11 N.Y.C.R.R. § 65.3-11(b).

100.    NF-3 forms are important because they certify that the pharmacy's request for payment is not materially false, misleading, or fraudulent subject to the following warning:

> "Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime[.]"

N.Y. Ins. Law § 403(d).

101.    A pharmacy's eligibility for No-Fault payments depends on its compliance with all applicable licensing requirements set forth under New York law.

102.    Pharmacies make material misrepresentations when they submit NF-3 bills that omit or misrepresent material information about the billed-for services or the pharmacy's eligibility to collect No-Fault payments.  Pharmacies also make material misrepresentations when they bill for drugs that are (a) never provided, (b) not medically necessary, (c) prescribed because of unlawful referral arrangements, (d) dispensed in violation of applicable licensing laws, and (e) billed at grossly excessive rates.

**D.    DRUG REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS**

103.    The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

104.    The Fee Schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq*.

105.    Representations about compliance with the Fee Schedule are material because insurers rely on the Fee Schedule to determine the proper level of payment on eligible claims.

106.    Prior to October 1, 2019, charges submitted by pharmacies were governed by 12 N.Y.C.R.R. § 440.5(a)(1)(i), mandating that a provider may charge no more than the Average Wholesale Price ("AWP") for the national drug code ("NDC") for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00, for brand name drugs or medicines, and minus 20% of the average wholesale price, plus a dispensing fee of $5.00, for generic drugs or medicines.

107.    The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged.  Each NDC number has a corresponding AWP, which identifies the price.

108.    AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed. 12 N.Y.C.R.R. § 440.2(a).

109.    For charges submitted by pharmacies for brand name and generic prescription drugs or medicines on or after October 1, 2019, 12 N.Y.C.R.R. § 440.5(a)(1)(ii) states that a provider may charge no more than, as applicable here, the lesser of the calculated cost or the usual and customary price for the prescription drug or medication.

110.    "Calculated cost means the average wholesale price for the national drug code of the prescription drug or medicine on the day it was dispensed plus a dispensing fee. For brand name drugs the calculated cost shall be AWP minus 12 percent of the average wholesale price

17

plus a dispensing fee of $4.  For generic drugs the calculated cost shall be AWP minus 20

percent plus a dispensing fee of $5."  12 N.Y.C.R.R. § 440.2(c).

111.    "Usual and customary price means the retail price charged to the general public

for a prescription drug."  12 N.Y.C.R.R. § 440.2(s).

112.    Pharmacies are prohibited from billing in excess of the Fee Schedule under New

York's No-Fault laws.

113.    Pharmacies are not eligible to collect No-Fault payments when they fail to meet

any applicable licensing requirements.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).  As alleged herein,

the Defendants failed to meet several laws and regulations when providing pharmacy services to

claimants during the course of this scheme.

## V.    SPECIFIC FACTS ABOUT THE DEFENDANTS' SCHEME TO DEFRAUD

### A.    OVERVIEW OF SCHEME

114.    The Defendants' scheme relied upon a steady stream of prescriptions for Topical

Pain Products.

115.    The scheme began with M&D.

116.    M&D did not operate like other legitimate retail pharmacies.

117.    M&D only billed for a closed set of specific medications, rather than a broad

array of drugs and other pharmacy products.

118.    M&D was housed in a storefront space, which had been previously used as a bar

room:

**BEFORE:**



**AFTER:**



119.    The Defendants deliberately pushed the Topical Pain Products through M&D because they could acquire the drugs at a low cost and then bill Allstate for them at a high price.

120.    TTC was also installed at a location no more than a mile away from M&D's location.

121.    M&D and TTC are linked together in several ways.  M&D and TTC billed for the same predetermined set of drugs, and even shared some of the same patients.

122.    The bills and records submitted by M&D and TTC used an identical format, even using the same colored tabs:

**M&D:**



**TTC:**



123.    The records submitted in support of M&D's and TTC's claims even contain similar markings, which identify referral sources.

124.    For example, M&D's and TTC's delivery receipts for patients referred by non-party referring physicians Joseph Raia, M.D. and Radha Gara, M.D. contained the notation "Flatbush":



| M&D | TTC |
|---|---|

125.    M&D's and TTC's records for patients referred by non-party Igor Zilberman, NP ("Zilberman"), contained the notation "3432":



| M&D | TTC |
|---|---|

126.    The Defendants are no strangers to fraud schemes.  They were accused of fraudulent pharmacy billing in *Gov't Empls. Ins. Co. v. M&D Elite Pharmacy, LLC*, No. 20-cv-05662-RRM-RML (E.D.N.Y.) and in *Gov't Empls. Ins. Co. v. Time to Care Pharmacy Inc.*, No. 22-cv-02158-AMD-RLM (E.D.N.Y.).  In both cases, Zagorin, Starchak, and Tabulov were accused of maintaining unlawful relationships with prescribing providers who steered bogus prescriptions to M&D and TTC in exchange for kickbacks or referral payments.

127.    Just as TTC was formed to replace M&D, First Class stepped into TTC's shoes at the same location at 248-47 Jericho Turnpike as a continuation of the Defendants' scheme to defraud:

**November 2020:**



**November 2021:**



**October 2022:**



128.    TTC and First Class also shared the same supervising pharmacist, Arati Shah.

129.    Here, the Defendants caused the Pharmacy Defendants to submit No-Fault claims even though (a) the prescriptions were issued pursuant to predetermined treatment protocols, which elevated profits over genuine patient care, (b) the prescriptions were invalid under New York law, (c) the prescriptions were issued in exchange for unlawful kickbacks or other incentives, and (d) the No-Fault claim documents submitted to Allstate falsely represented the Pharmacy Defendants' eligibility to collect No-Fault payments.

130.    Even if the prescriptions were needed (they were not), the claimants still had no choice of where to obtain the medications, which were purportedly delivered to the claimants at their homes or at the prescribing clinics.  The Pharmacy Defendants are located in Queens County, yet many of the claimants billed by the Pharmacy Defendants reside outside of Queens County, which means that the Pharmacy Defendants would not have received the prescriptions absent an agreement to steer them to the pharmacies:

| Claimant | Claimant's Residence | Pharmacy | Distance from Pharmacy |
|---|---|---|---|
| Y.T. (0483511465) | New York, NY | M&D | 17.8 miles |
| B.T. (0468680418) | Brooklyn, NY | M&D | 11.8 miles |
| A.C. (0471841072) | Bronx, NY | M&D | 21.7 miles |
| R.G. (0483511465) | Manhattan, NY | M&D | 17.8 miles |
| E.A. (0490858859) | Bronx, NY | M&D | 19.7 miles |
| N.N. (0511026767) | Brooklyn, NY | M&D | 14.6 miles |
| C.J. (0515919793) | Bronx, NY | M&D | 19.8 miles |
| F.S. (0516701000) | Staten Island, NY | M&D | 24 miles |
| E.S. (0521195361) | Spring Valley, NY | M&D | 43.1 miles |
| J.O. (0557209814) | Bronx, NY | M&D | 20.8 miles |
| J.R. (0559183124) | Brooklyn, NY | M&D | 10.6 miles |
| E.V. (0576449219) | Bronx, NY | M&D | 19.2 miles |
| C.A. (0581103751) | Bronx, NY | M&D | 17.7 miles |
| D.M. (0545786337) | Harriman, NY | M&D | 62.5 miles |
| M.S. (0597880426) | Bethlehem, PA | TTC | 109 miles |
| R.R. (0566069795) | Shirley, NY | TTC | 55.7 miles |

| Claimant | Claimant's Residence | Pharmacy | Distance from Pharmacy |
|---|---|---|---|
| M.F. (0591838099) | New York, NY | TTC | 18.2 miles |
| M.B. (0598385318) | Mount Vernon, NY | TTC | 16.9 miles |
| J.W. (0567310065) | Staten Island, NY | TTC | 32.6 miles |
| J.S. (0608228540) | Bridgeport, CT | TTC | 56.4 miles |
| I.R. (0566069795) | Shirley, NY | TTC | 55.7 miles |
| H.C. (0589333961) | New York, NY | TTC | 14.1 miles |
| A.R. (0569264005) | Staten Island, NY | TTC | 43 miles |
| C.S. (0583410451) | Bronx, NY | TTC | 15.4 miles |
| B.H. (0554879247) | Bronx, NY | TTC | 12.6 miles |
| B.U. (0557845935) | Bronx, NY | TTC | 14.7 miles |
| A.M. (0582275855) | Yonkers, NY | TTC | 23 miles |
| S.V. (0645694928) | Astoria, NY | First Class | 13.8 miles |
| S.J. (0643586837) | Jersey City, NY | First Class | 26.2 miles |
| M.M. (0658564539) | Brooklyn, NY | First Class | 17.9 miles |
| J.C. (0672845518( | Baldwin, NY | First Class | 12.5 miles |
| F.G. (0658564539) | Brooklyn, NY | First Class | 16.3 miles |
| D.S. (0978839364) | Brooklyn, NY | First Class | 15.7 miles |
| C.R. (0674646807) | Brooklyn, NY | First Class | 14.9 miles |

131.    The prescriptions were sourced from medical providers and clinics with strong links to organized crime and other No-Fault schemes.

132.    For example, M&D billed for numerous prescriptions from a clinic located at 764 Elmont Road in Elmont, NY, which was illegally owned and controlled by unlicensed laypersons. *See Gov't Empls. Ins. Co. v. Healthy Age Medical, P.C.*, No. 19-cv-02398-AMD-VMS (E.D.N.Y.).   The 764 Elmont Road clinic participated in a massive fraud scheme that involved staging accidents, paying bribes for patient information, steering patients to illegal clinics controlled by unlicensed persons, paying kickbacks for patient referrals, and billing for fraudulent medical services. *See United States v. Rose*, No. 19-cr-000789-PGG (S.D.N.Y.).

133.    The prescriptions were phony or fabricated in certain cases, which means that M&D and TTC billed for drugs that were not actually prescribed.

134. For example, M&D and TTC billed for drugs supposedly prescribed by non-party physician Radha Gara, M.D. ("Gara"), who is linked to several No-Fault fraud schemes. Notably, prescriptions issued in Gara's name were forged or altered to include drugs that he did not prescribe to patients. *See Gov't Empls. Ins. Co. v. Health Choice Pharmacy, Inc.*, No. 22-cv-02867-KAM-MMH (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Atlas Pharmacy, LLC*, No. 20-cv-03643-RRM-PK (E.D.N.Y.).

135. On April 2, 2020, Gara supposedly examined claimant C.A. (claim no. 0581103751) and made a series of recommendations for additional treatment, including over-the-counter pain relief drugs such as naproxen, ibuprofen, or Tylenol. Importantly, Gara never ordered prescription drugs as part of C.A.'s initial examination; instead, the examination form was altered to make it look like medications were prescribed on an attachment:



136. However, the "attachment" to Gara's examination report for C.A. was a pre-printed M&D order form, which listed the specific drugs and quantities to be dispensed. M&D's prescription order forms are prohibited because the forms list multiple drug products and because New York law requires electronic prescriptions except in limited circumstances not present here:

M & D Elite Pharmacy LLC
239-19 Braddock Ave
Bellerose NY 11426
Phone (646)568-6448 Fax (646) 568-6449

Physician Name: *RADHA K. GARA*

Address:

Phone:

NPI: *1922354547* DEA:                Lic: *23 7012*

Patient Information:

Name: C███████ A███████

DOB: ███████

Delivery Address:

Telephone number:

| | | |
|---|---|---|
| Cyclobenzaprine 5 mg<br>Cyclobenzaprine 10 mg | SIG: Take 1 tablet every 8 hours | # 60 / # 90 |
| Meloxicam 7.5 mg<br>Meloxicam 15mg | SIG: Take 1 tablet daily | # 30 |
| Baclofen 20 mg | SIG: 1 tablet 3 times a day | # 90 |
| Ibuprofen 600 mg<br>Ibuprofen 800 mg | | # 30 / #60 / #90 |
| Gabapentin 300 mg<br>Gabapentin 600 mg<br>Gabapentin 800 mg | SIG: Take 1 capsule three time daily | #90 |
| Lidocaine 5% ointment | SIG: apply 1-2 grams up to 4 times daily prn pain | # 100gm  /#200gm |
| Naproxen 550 mg | SIG: 1 tablet twice a day<br>*after meals* | # 60 |

137.    M&D and TTC also submitted other prescription forms bearing Gara's name. The forms were designed to look like electronic prescription forms, but they were not, such as those forms purporting to prescribe lidocaine 5% ointment and naproxen to claimants C.A. (claim no. 058110375) and A.M. (claim no. 0578706798):



\*\*\*\*\*\*\*\*\*\*



138.    The prescription forms themselves were nothing more than unsigned copies, the existence of which demonstrates the fraudulence of the Pharmacy Defendants' No-Fault claims. Indeed, Gara has denied ever issuing an electronic prescription because he lacked the account credentials to do so.  *See Gov't Empls. Ins. Co. v. Time to Care Pharmacy, Inc.*, No. 22-cv-

02158-AMD-RLM (E.D.N.Y.) (citing Gara's non-party deposition testimony from *Gov't Empls. Ins. Co. v. Custom Rx Pharmacy LLC*, No. 20-cv-02622-CBA-SJB (E.D.N.Y.)).

139.    TTC has been identified as billing for Topical Pain Products pursuant to prescriptions that were not authorized by the provider and also were nothing more than unsigned copies.

140.    Non-party Arkam Rehman, M.D. ("Rehman") has stated in a sworn affidavit that TTC billed for drugs pursuant to prescriptions that he "did not issue or authorize." *See* Exhibit 1. Indeed, Rehman stated that he "did not prescribe or authorize the prescription for any medication, creams, patches, or ointments" billed by TTC. *Id*.

141.    Rehman also provided specific examples of bogus prescription forms generated by TTC, which were fraudulent because Rehman did not sign the prescriptions, or otherwise order or prescribe the drugs for the patient:



*See* Exhibit 1.

142.    TTC also billed Allstate for drugs, including diclofenac sodium 3% gel, prescribed in the same manner identified by Rehman as fraudulent such as those prescriptions for claimants A.N. (claim no. 0600671804) and L.V. (claim no. 0605948736):



\*\*\*\*\*\*\*\*\*\*

143.    M&D and TTC also have strong ties to non-party Metro Pain Specialists P.C. ("Metro Pain"), which was a source of prescriptions for unnecessary, unwarranted, and unneeded Topical Pain Products billed to Allstate.   Metro Pain has been accused of participating in unlawful referral relationships with other providers.   *See Gov't Empls. Ins. Co. v. John Street*

*Pharmacy, LLC*, No. 22-cv-05651-EK-JMW (E.D.N.Y.); *Allstate Ins. Co. v. Metro Pain Specialists Professional Corporation*, No. 21-cv-05586-DG-RER (E.D.N.Y.); *State Farm Mut. Ins. Co. v. Metro Pain Specialists Professional Corporation*, No. 21-cv-05523-MKB-PK (E.D.N.Y.).

144.    M&D and TTC submitted numerous No-Fault claims to Allstate supported by prescriptions that were purportedly issued by providers working for Metro Pain, including non-parties John Greco, M.D. ("Greco"), Hong Pak, M.D. ("Pak"), Antohi Petronela, M.D. ("Petronela"), and Michael Alleyne, M.D. ("Alleyne").

145.    Alleyne has stated in a sworn affidavit that Metro Pain submitted prescription forms bearing his name that were altered, without his permission, to include additional Topical Pain Products, including lidocaine 5% patches.

146.    Alleyne identified several clinic locations associated with Metro Pain:

> 4. I worked for Metro Pain examining patients at various no-fault medical clinics throughout the New York City area including, among others, clinics located at the following addresses:
> - 1767 Southern Boulevard, Bronx NY
> - 1894 Eastchester Road, Bronx, NY
> - 2940 Grand Concourse, Bronx, NY
> - 204-12 Hillside Avenue, Hollis, NY
> - 105-10 Flatlands Avenue, Brooklyn, NY
> - 2488 Grand Concourse, Bronx, NY
> - 2386 Jerome Avenue, Bronx, NY
> - 1100 Pelham Parkway, Bronx, NY
> - 3041 Avenue U, Brooklyn, NY

147.    M&D and TTC billed for drugs purportedly prescribed by providers working for Metro Pain at these locations, including, for example, Pak and Petronela at 1100 Pelham Parkway and Greco at 2488 Grand Concourse:

 

**\*\*\*\*\*\*\*\*\*\***



**\*\*\*\*\*\*\*\*\*\***



148.   According to Alleyne, he was required to follow a predetermined prescription protocol, and his continued employment at Metro Pain was conditioned on his prescribing of Topical Pain Products using a pre-printed prescription form.  Alleyne also described how Metro Pain administrative staff enforced this requirement:

> 6. The administrative staff at the various clinics from where I worked for Metro Pain would also continuously insist that I authorize these prescriptions.  In the event I did not consistently authorize prescriptions for Topical Pain Products to Metro Pain's patients, I would get persistent reminders or admonishing phone calls from clinic staff about not prescribing in accordance with the prescription regimen.  I was once yelled at by one of these individuals for not issuing prescriptions for Topical Pain Products to patients.  At times, I was asked to sign blank pre-printed prescription forms so that the clinics' staff could fill in the medications that Dr. Shapiro required be prescribed to Metro Pain's patients. I also learned that Metro Pain obtained a stamp of my signature without my consent or authorization, but I do not know what they use the stamp for or if it has ever been used on prescriptions for pharmaceuticals.

149.   Alleyne "rarely, if ever, prescribed Lidocaine/Lidoderm 5% Patches and [he] would never simultaneously prescribe both Lidocaine 5% Ointment and Lidocaine/Lidoderm 5% Patches because doing so could cause various side effects including dizziness and a sudden decrease in blood pressure, and could result in overdosing the patient."

150.    First Class billed for numerous prescriptions from providers working for Metro Pain's successor, Tri-borough NY Medical Practice, P.C. ("Tri-borough"), which also has been named as a defendant in a case involving fraudulent No-Fault claims. *See State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C.*, No. 21-cv-05523 (E.D.N.Y.).

151.    First Class billed for drugs purportedly prescribed by providers treating patients at Tri-borough, including Patricia Kelly, D.O. ("Kelly"), Jean Marie Gaetan, NP ("Gaetan"), and Deonarine Rampershad, NP ("Rampershad").

152.    These providers have been the subject of allegations that they prescribed medically unnecessary drugs, medications, and/or durable medical equipment in furtherance of Tri-borough's predetermined treatment protocol and unlawful referral relationships with pharmacies and equipment suppliers. *See Allstate Ins. Co. v. Mazal Pharmacy, Inc.*, No. 1:24-cv-06570 (E.D.N.Y. 2024) (alleging that Gaetan prescribed unnecessary lidocaine 5% ointment at the initial examination without attempting commercially available products); *Gov't Empls. Ins. Co. v. Ideal Care Pharmacy, Inc.*, No. 1:22-cv-03630 (E.D.N.Y.) (alleging that Rampershad prescribed unnecessary lidocaine 5% ointment at the initial examination pursuant to an unlawful referral relationship); *see also Liberty Mut. Ins. Co. v. First Supply, Inc.*, No. 1:23-cv-08367 (E.D.N.Y.) (alleging that Rampershad prescribed unnecessary and fraudulent durable medical equipment at the initial examination pursuant to a predetermined treatment protocol); *Gov't Empls. Ins. Co. v. Orthopain Supply, Inc.*, No. 23-cv-03413-RPK-RER (E.D.N.Y.) (citing to statements under oath of Tri-borough provider Kelly regarding unauthorized prescriptions for durable medical equipment (DME) with copies or forgeries of her signature used without consent in support of allegations of unlawful referral relationships between illegitimate DME providers and Tri-borough clinics).

153.    M&D and First Class also billed for drugs that were never even dispensed to claimants.

154.    For example, M&D billed Allstate for drugs that were never actually dispensed to claimant S.R. (claim no. 0555353697), who was reportedly involved in an automobile accident on July 15, 2019.  S.R. underwent a pain management consultation on August 29, 2019 during which diclofenac sodium 3% gel and cyclobenzaprine were supposedly prescribed.    On September 4, 2019, M&D billed Allstate a total of $2,016.26 for diclofenac sodium 3% gel and cyclobenzaprine that was purportedly delivered to S.R.

155.    M&D's bills for S.R. are false because S.R. denied receiving any prescription medication during treatment:

```
 1              S███████   R███████:
 2       A        Patches, no.
 3       Q        Did you ever receive any
 4  prescription gel, ointment or cream
 5  medication?
 6       A        No.
 7       Q        In connection with the accident,
 8  did you ever receive any prescription pill
 9  medications?
10       A        No.
```

156.    Likewise, First Class billed Allstate for drugs that were never actually dispensed to claimant H.F. (claim no. 066824923), who was reportedly involved in an automobile accident on May 7, 2022. On May 19, 2022, H.F. was prescribed lidocaine 5% ointment, naproxen sodium tablets, and cyclobenzaprine tablets. According to a delivery receipt initialed by Girenko, First Class purportedly delivered this medication to H.F. on May 26, 2022:



157.    However, this delivery receipt was false and fraudulent because H.F. testified that when the receptionist at the clinic attempted to hand him medications, he "declined." Therefore, all of First Class's bills for medications purportedly delivered to H.M. are false:

```
17              If I told you that Allstate
18   received bills for medication that were
19   prescribed for you and taken by you, would
20   those bills be valid?
21      A.     No.
22      Q.    Is it correct that you declined
23   all medication offered to you at the
24   therapy office?
25      A.     That is correct.
```

**********

35

```
 2        Q.     So the bill that Allstate
 3   received from First Class Pharmacy Corp.
 4   for Naproxen 550 milligrams was never
 5   received by you; is that correct?
 6        A.     That is correct.
 7        Q.     The bill that Allstate received
 8   from First Class Pharmacy Corp. for
 9   Lidocaine External Ointment five percent,
10   was that declined by you?
11        A.     That is correct.
12        Q.     We can't hear.
13        A.     That is correct.
14        Q.     The bill that Allstate received
15   from First Class Pharmacy Corp. for
16   Cyclobenzaprine Hydrochloride Oral Tablets
17   ten milligrams, was that declined by you?
18        A.     That is correct.  I received no
19   forms of medication whatsoever.
```

### B. PROFIT MOTIVE

158. The Defendants pushed a predetermined set of drugs through the Pharmacy Defendants, including the Topical Pain Products and other pain relief medications. The drugs were unnecessary, unwarranted, ineffective, and prescribed regardless of whether patients needed—or even wanted—them.

159. The same or similar products were available over-the-counter and at a lower cost; however, pharmacies cannot collect No-Fault payments for over-the-counter drugs. The Defendants therefore focused on prescription drugs, including the Topical Pain Products.

160. The Defendants targeted specific drugs that could be acquired at a low cost but billed at a high rate. The Defendants exploited the difference between AWPs and actual

36

acquisition costs to generate massive profits through the Pharmacy Defendants' billing for these bogus drugs.

161.    The charts attached hereto as Exhibits 2-4 contain non-exhaustive listings of the Pharmacy Defendants' billing for bogus Topical Pain Products.

162.    One of the most popular drugs pushed by the Defendants was the generic form of lidocaine 5% ointment:

| **Drug Name** | **Pharmacy** | **NDC** | **AWP** |
|---|---|---|---|
| Lidocaine 5% Ointment | M&D | 50383-0933-55 | $380.93 |
| Lidocaine 5% Ointment | M&D | 51672-3008-03 | $380.93 |
| Lidocaine 5% Ointment | M&D; TTC | 52565-0008-55 | $380.93 |
| Lidocaine 5% Ointment | M&D; TTC | 68462-0418-27 | $380.93 |
| Lidocaine 5% Ointment | M&D; TTC | 50742-0306-50 | $380.93 |
| Lidocaine 5% Ointment | M&D; TTC; First Class | 65162-0918-53 | $380.93 |
| Lidocaine 5% Ointment | First Class | 51672-3008-05 | $380.93 |
| Lidocaine 5% Ointment | First Class | 67877-0473-80 | $380.50 |

163.    The published AWP of lidocaine 5% ointment (NDC No. 65162-0918-53) is $380.93 per 50-gram package.

164.    Claimants were routinely prescribed 200 grams of lidocaine 5% ointment as part of this scheme, which allowed the Pharmacy Defendants to bill Allstate a total of $1,523.72 for a 200-gram supply.

165.    The Pharmacy Defendants' billing for lidocaine 5% ointment under NDC No. 65162-0918-53 exploited the Fee Schedule.  The wholesale acquisition price (WAC) of lidocaine 5% ointment sold under NDC No. 65162-0918-53 is only $50.00 for a 50-gram supply.

166.    Here, the Defendants were able to generate a profit of over $1,000.00 each time the Pharmacy Defendants billed for 200 grams of lidocaine 5% ointment under NDC No. 65162-0918-53 after application of the 20% reduction required under applicable New York law.

167.    The Defendants engaged in similar exploitation through M&D's and TTC's billing for diclofenac sodium 3% gel.

168.    M&D and TTC billed for diclofenac sodium 3% gel sold under NDC No. 68462-0355-94 and NDC No. 71085-0003-00, which has a published AWP of $1,179.46.  Claimants were routinely prescribed a 200-gram supply of diclofenac sodium 3% gel, which meant that M&D and TTC could bill Allstate a total of $1,887.14 for each prescription.[1]

169.    The WAC for diclofenac sodium 3% gel under NDC No. 68462-0355-94 is $92.97 per 100 grams.  However, the WAC grossly exceeds the Defendants' actual acquisition cost for the same drug.  According to an invoice from M&D's wholesale distributor (non-party Dsquared Pharmaceuticals, Inc.), the Defendants actually acquired the same diclofenac sodium 3% gel under NDC No. 71085-0003-00 for a cost of only $11.00 per 100 grams:



---

[1] Stated price includes application of the 20% reduction required under applicable New York law.

170.    Accordingly, the Defendants were able to generate a profit of over $1,850.00 each time that M&D and TTC billed for 200 grams of diclofenac sodium 3% gel under NDC No. 71085-0003-00.

C.    FRAUDULENT PHARMACY CLAIMS

1.    Predetermined Protocols and Prohibited Referrals

171.    The Defendants collaborated with providers and clinics that would order the Topical Pain Products for all claimants, and then steer the prescriptions to the Pharmacy Defendants.

172.    The Pharmacy Defendants billed for drugs prescribed pursuant to fraudulent predetermined treatment protocols.    Indeed, the prescriptions were generated by providers working for Metro Pain, Tri-borough (its successor), and many others.

173.    For example, M&D billed for drugs prescribed by non-party Colin Clarke M.D. ("Clarke"), who is a physician implicated in other fraud schemes.  *See Gov't Empls. Ins. Co. v. Clarke*, No. 20-cv-02457-RRM-PK (E.D.N.Y.) (alleging that Clarke issued prescriptions for medically unnecessary durable medical equipment pursuant to unlawful referral relationships); *Allstate Ins. Co. v. Rose,* No. 1:22-cv-00279-WFK-MMH (E.D.N.Y.) (alleging that Clarke ceded control of a PC to a non-physician and caused this PC to bill for medically unnecessary treatment).  Non-party Melana Kay ("Kay"), an unlicensed person, recently disclosed that she helped control Clarke's practice, which operated from at least 10 different clinic locations in Brooklyn, Queens, and the Bronx.  *See Gov't Empls. Ins. Co. v. Clarke*, No. 1:23-cv-4605-FB-SJB (E.D.N.Y.), at Dkt. No. 70-1.  According to Kay, as a condition of operating at the clinics, Clarke's practice was required to write prescriptions for certain drugs, which were filled by pharmacies affiliated with the clinics.  *Id.*

174.    As demonstrated below, many of the prescribers are linked to other No-Fault fraud schemes, most of which involved illegal clinic control, predetermined treatment protocols, bogus prescriptions, and prohibited referrals:

| Prescribing Provider | Pharmacy Defendant | Associated Medical Practice | Fraud Cases |
|---|---|---|---|
| Mark Gladstein, M.D. | M&D; TTC | Metropolitan Medical and Surgical, P.C. d/b/a Pain Medicine of New York and Pain Medicine Associate of New York | *Liberty Mut. Ins. Co. v. Advanced Comprehensive Laboratory, LLC, et al.*, No. 1:22-cv-03541-AMD-JRC (E.D.N.Y.) (alleging that lab owned by Gladstein submitted fraudulent bills for medically unnecessary urine drug screening tests under NY No-Fault law); *Gov't Empls. Ins. Co. v. Advanced Comprehensive Laboratory, LLC, et al.*, No. 1:20-cv-02391-KAM-VMS (E.D.N.Y.) (same);*American Transit Ins. Co. v. Advanced Comprehensive Laboratory, LLC, et al.*, No. 1:21-cv-00413-MKB-JRC (same). |
| Hong Pak, M.D. | M&D; TTC | Metro Pain Specialists, PC; Pak Hong Sik MD Medical Care PC | *Gov't Empls. Ins. Co. v. Wallegood, Inc., et al.*, No. 1:21-cv-01986-PKC-RLM (E.D.N.Y.) (alleging that Pak prescribed medically unnecessary durable medical equipment to patients pursuant to an unlawful referral relationship); *Liberty Mut. Ins. Co. v. AVK Rx Inc., et al.*, No: 22-cv-07329-GRB-SIL (E.D.N.Y.) (alleging that Pak made unlawful referrals of prescription drugs to pharmacies); *Gov't Empls. Ins. Co. v. Ultimed Health Care, P.C., et al.*, No. 3:18-cv- |

| Prescribing Provider | Pharmacy Defendant | Associated Medical Practice | Fraud Cases |
|---|---|---|---|
| | | | 16887-BRM-LHG (D.N.J.) (alleging that Pak performed medically unnecessary initial examinations and electrodiagnostic testing and engaged in unlawful self-referrals). |
| Joseph Raia, M.D. | M&D; TTC | Joseph Raia, M.D., P.C. | *United States v. Rose*, 19-cr-00789-PGG (S.D.N.Y.) (criminal action involving massive No-Fault fraud scheme; investigation of scheme uncovered Raia's communications and dealings with members of the conspiracy); *Allstate Ins. Co. v. Raia, et al.*, No. 1:24-cv- (alleging that Raia was the nominal owner of medical PCs that were illegally operated and controlled by laypersons).[2] |
| Radha Gara, M.D. | M&D; TTC | Gara Medical Care, P.C. | *Gov't Empls. Ins. Co. v. Wellmart Rx, Inc., et al.*, No. 1:19-cv-04414-KAM-RLM (E.D.N.Y.) (alleging that Gara engaged in illegal, collusive referral arrangement with a No-Fault pharmacy to generate fraudulent prescriptions for topical pain products). |
| Joanne Magro, M.D. | M&D | City Anesthesia Healthcare, P.C. | *Gov't Empls. Ins. Co. v. Wellmart Rx, Inc., et al.*, No. 1:19-cv-04414-KAM-RLM (E.D.N.Y.) (alleging that Magro prescribed medically unnecessary topical gels and |

---

[2] Raia is also banned from participating in federal health care programs under a 15-year minimum exclusion, which began in 2014.  See Office of Inspector General Action Details February 11, 2014 and Media Communications March 12, 2014 News Release.

| Prescribing Provider | Pharmacy Defendant | Associated Medical Practice | Fraud Cases |
|---|---|---|---|
|  |  |  | ointments pursuant to a collusive and illegal arrangement with a pharmacy). |
| Delys St. Hill, M.D. | M&D | Metro Pain Specialists, PC | *Gov't Empls. Ins. Co. v. Fano, et al.*, No. 2:21-cv-10433-JXN-MAH (D.N.J.) (alleging that St. Hill purportedly performed medically unnecessary professional physician services billed for by an entity owned by a chiropractor). |
| Augustus Igbokwe, PA | M&D; TTC | Pain Medicine of New York | *Liberty Mut. Ins. Co. v. AVK Rx Inc., et al.*, No. 2:22-cv-07329-GRB-SIL (E.D.N.Y.) (alleging that Igbokwe entered into illegal, collusive referral arrangement with pharmacies for the prescription of large volumes of topical products). |
| Paula Brown, M.D. | M&D | Moses Medical Services, PLLC | *Liberty Mut. Ins. Co. v. AVK Rx Inc., et al.*, No. 2:22-cv-07329-GRB-SIL (E.D.N.Y.) (alleging that Brown entered into illegal, collusive referral arrangement with pharmacies for the prescription of large volumes of topical products). |
| Ruben Oganesov, M.D. | M&D | Healthwise Medical Services, P.C. | *Gov't Empls. Ins. Co. v. Chai Diagnostics LLC, et* al., 1:24-cv-02704-EK-PK (E.D.N.Y.) (identifying forged prescriptions and referral forms); *Gov't Empls. Ins. Co. v. Emmons Avenue Medical Office, P.C., et al.*, No. 1:22-cv-03922-RPK-PK (E.D.N.Y.) (alleging that Oganesov, who practiced and resided in MA, engaged in illegal referral and kickback arrangements to |

| Prescribing Provider | Pharmacy Defendant | Associated Medical Practice | Fraud Cases |
|---|---|---|---|
| | | | obtain patients who were subjected to unnecessary services); *Gov't Empls. Ins. Co. v. Oganesov, et al.*, No. 1:22-cv-05693-ENV-PK (E.D.N.Y.) (alleging that Oganesov conspired with non-physicians to use a PC to submit fraudulent charges for medically unnecessary services purportedly provided to patients obtained through unlawful referral arrangements). |
| Phelan Clancy, NP | First Class | Phelan Clancy NP in Adult Health, P.L.L.C. | *Gov't Empls. Ins. Co. v. Clancy*, No. 1:22-cv-07635-NGG-PK (E.D.N.Y.) (alleging that Clancy ceded control of her PC to unlicensed individuals, which was used to bill for services pursuant to a predetermined treatment protocol and unlawful referrals). |
| Inna Levtsenko, NP | First Class | Inna Levtsenko Nurse Practitioner in Adult Health, P.C. | *Gov't Empls. Ins. Co. v. Chai Diagnostics LLC, et* al., 1:24-cv-02704-EK-PK (E.D.N.Y.) (identifying forged and unauthorized drug prescriptions); *Liberty Mut. Ins. Co. v. RHS Chiropractic, P.C.*, No. 1:24-cv-02172-FB-VMS (E.D.N.Y.) (alleging that Levtsenko ceded control of her PC to unlicensed individuals, which PC was used as a vehicle to "prescribe unnecessary and expensive pharmaceuticals"). |

## 2. Unlawful Pre-Printed Prescriptions

175. The Defendants used pre-printed forms imprinted with M&D's and TTC's letterhead to steer the prescriptions to M&D and TTC.

176. The forms were arranged as a checklist to ensure that specific drugs were ordered, such as lidocaine 5% ointment and patches and diclofenac sodium 3% gel:



M & D Elite Pharmacy LLC
239-19 Braddock Ave
Bellerose NY 11426
P (646-568-6448
F (646)568-6449

Physician Name: Cristy Perduc, MD

Address: 2076 East 13 Street, Brooklyn NY 11229
Phone: (718)382-7900

NPI: 1417153289   DEA: FP3209360 Lic: 264-248

Patient Information:

Name: ▓▓▓▓▓  DOB: ▓▓▓▓▓
Address:

| Cyclobenzaprine 10mg | SIG: Take 1 tablet every 8 hours | # 90 |
| Meloxicam 15mg | SIG: Take 1 tablet daily | # 30 |
| Gabapentin 100mg | SIG: Take 1 capsule three time daily | #90 |
| Lidocaine 5% ointment | SIG: apply 1-2 grams up to 4 times daily prn pain | # 100gm |
| Lidoderm 5% patch | SIG: apply 1-4 patches to affected area for 12 hours daily | # 30  # 60  # 90 |
| Pennsaid (Diclofenac) 1.5% Solution | SIG: apply 40 drops to affected area four times daily | # 150 ml |

| Pain Compound # 1: | Pain Compound # 2: |
| Diclofenac 5%<br>Ibuprofen 5%<br>Lidocaine 4%<br>Gabapentin 4%<br>Cream Base QSAD 180mg | Diclofenac 6%<br>Lidocaine 4%<br>Ibuprofen 6%<br>Baclofen 4%<br>Amitriptyline 2%<br>Cream Base QSAD 180 mg |

Prescriber Signature _____   Date: 12/4/17



Graham Wellness
145 Graham Ave
Brooklyn NY 11206

**TIME TO CARE PHARMACY INC**
248-47 JERICHO TURNPIKE
BELLEROSE, NY 11426
PHONE (929) 207-5300 / FAX (929) 207-5400

Doctor's Name: Igor Zilberman, NP
Address: 90-17 Jamaica Avenue Woodhaven, NY 11421     Phone: 718-441-9300
          2076 East 13th Street Brooklyn NY 11229        718-382-7900
NPI#: 175-030-6676          DEA:  MZ4212786          LICENSE#: F341342

Patient's Name: _____     DOB: _____
Delivery Address: _____Office_____     Phone: _____

| Medication | SIG | Quantity |
|---|---|---|
| Cyclobenzaprine 5 mg | SIG: Take 1 tablet every 8 hours | # 60 / # 90 |
| Cyclobenzaprine 10 mg | SIG: Take 1 tablet every 8 hours | # 60 / # 90 |
| Meloxicam 7.5 mg | SIG: Take 1 tablet daily | # 30 |
| Meloxicam 15 mg | SIG: Take 1 tablet daily | # 30 |
| Baclofen 20 mg | SIG: 1 tablet 3 times daily | # 90 |
| Ibuprofen 600 mg | | # 30 / # 60 / # 90 |
| Ibuprofen 800 mg | | # 30 / # 60 / # 90 |
| Gabapentin 300 mg | SIG: Take 1 capsule 3 times daily | # 90 |
| Gabapentin 600 mg | SIG: Take 1 capsule 3 times daily | # 90 |
| Gabapentin 800 mg | SIG: Take 1 capsule 3 times daily | # 90 |
| Lidocaine 5% Ointment | SIG: Apply 1-2 grams up to 4 times daily prn pain | # 100 gm / # 200 gm |
| Naproxen 550 mg | SIG: Take 1 tablet 2 times daily | # 60 |
| Diclofenac 3% Gel | SIG: Apply to affected area 2 times daily | # 100 gm / # 200 gm |
| Celecoxib 100 mg | SIG: | # 60 |
| Celecoxib 200 mg | SIG: | # 60 |
| Tizanidine 2 mg cap | SIG: | # 30 |
| Tizanidine 4 mg cap | SIG: | # 30 |

Prescriber Signature: _____     Date: 12/3/19

177.     First Class also billed for Topical Pain Products prescribed using preprinted checklists. For example, First Class billed for lidocaine 5% ointment purportedly prescribed by Gaetan using the following preprinted form:

 

| | | | |
|---|---|---|---|
| **Rx PHARMACY** | This facsimile transmission is intended to be delivered to the named, address and may contain information that is confidential privileged and proprietary or exempt from disclosure under applicable law, if is received by a none other  than there named, addressed, please destroy. | | |

| Name: ███████  ███ C███████ | | DOA |
|---|---|---|
| Address: | | |
| Home Phone: | | |
| Medication Allergies: | | |
| Insurance: | | |
| Carrier/claim #: | | |

| Ibuprofen tablets: SIG  QD BID TID QID  Once per day___ Twice a day___ Strength: 600mg___  800mg___  Disp: 30___ 60___ 90___ 120___ | Celebrex Tablets:  Once per day___ Twice a day___ Strength: 200mg___  400 mg___  Disp: 30___ 60___ 90___ | Naproxen Tablets:  Once per day___ Twice a day___  Strength: / 550mg___  Disp: 30___ 60___ | Cyclobenzaprine Tablets:  Strength: 100mg___  800 mg  Disp: 30___ 60___ 90___ |
|---|---|---|---|
| **Dicofenac Sodium Gel 3%**  Once per day___ Twice a day___  Strength: 200gm___  250gm___ | **Lidocaine Ointment 5%**  Once per day___ Twice a day___  Strength: 200gm___  250gm___ | **Lidotilol Patch**  Lidocaine 4.5% Menthol 5  Once per day___ Twice a day___  Disp: 45___ 60___ | **Pennsaid 2%:**  Once per day___ Twice a day___  Disp: 120___ |
| **Zipsor Capsules (NSAID):**  Strength: 250mg___  Disp: 120___ | **Topiramante:**  Strength: 25mg___ 50mg___ 100mg___  Disp: _____ | **Sumatriptan Tablets:**  Strength: 25mg___ 50mg___  Disp: 9___ 18___ | **Other:** |

| Prescriber Information: | | |
|---|---|---|
| Doctors Name:     GAETAN JEAN-MARIE | | |
| Address:     60 BELMONT AVE BROOKLYN, NY 11212 | | |
| NPI# 1477159515 | License#:     346718 | |

Statement of Medical Necessity:

Side effects associated with oral administration can often be avoid when medications are used topically. When Medications are administered topically. They are not observed through the gastrointestinal system and do not undergo first pass hepatic metabolism. Topical creams/patches will be used in conjunction with lower doses of oral medication to prevent dependence and side effects in oral medications.

| Physician Signature: | Date: 3/3/22 |
|---|---|

178.    Notably, this form submitted to First Class is the same type of form identified by

Rehman as used to submit fraudulent and unauthorized prescriptions:



*See* Exhibit 1.

179.    The Defendants violated New York law by (a) colluding with prescribing

providers to promote certain drugs to exploit the patient for their financial gain, (b) advertising

their pharmacy services through the provision of pharmacy blanks imprinted with M&D's and

TTC's name, and/or (c) dispensing drugs prescribed using pre-printed checklists of multiple drugs. *See* 8 N.Y.C.R.R. § 29.1(b)(2); 8 N.Y.C.R.R. § 29.7(12); N.Y. Educ. Law § 6810(7)(a).

### 3.   **Forced Prescriptions**

180.   The Defendants' scheme was designed such that claimants did not have a choice about where their prescriptions were filled; it was part of the scheme to steer prescriptions to the Pharmacy Defendants, and then have the Pharmacy Defendants deliver the drugs directly to the claimant's home or the prescriber's clinic.

181.   According to claimant A.A. (claim no. 0559225818), the drugs were delivered directly to the prescriber's clinic. Zagorin's initials appear on the M&D delivery form for claimant A.A., which demonstrates both Zagorin's direct involvement in the delivery of bogus drugs, and his connections to the prescribing providers and clinics:



182.   Claimant C.C. (claim no. 0552706979) also testified that M&D delivered drugs directly to the prescriber's clinic. Starchak's signature appears on the M&D delivery form for claimant C.C., which demonstrates both Starchak's direct involvement in the delivery of bogus drugs, and his connections to the prescribing providers and clinics:



183.    Claimant E.F. (claim no. 0587222860) was prescribed cyclobenzaprine tablets, naproxen sodium tablets, and lidocaine 5% ointment by Alleyne at Metro Pain on August 19, 2020. According to E.F., she received the medications "[a]t the therapy place." Tabulov's initials appear on the TTC delivery form for claimant E.F., which demonstrates both Tabulov's direct involvement in the delivery of bogus drugs, and his connections to the prescribing providers and clinics:



184.    Likewise, claimant M.B. (claim no. 0598385318) testified that Greco prescribed her "a lot of pain meds" at her initial visit at Metro Pain, including topical lidocaine. TTC billed Allstate for lidocaine 5% ointment prescribed by Greco on August 31, 2020, the day after M.B. was purportedly involved in a motor vehicle accident on August 30, 2020. According to M.B., she picked up the medication "from the office" and never went to a pharmacy. She was never asked what pharmacy she used.

185.    Tabulov initialed the delivery receipt for the medications, including lidocaine 5% ointment, purportedly delivered to M.B. at the Metro Pain clinic, which further demonstrates both Tabulov's direct involvement in the delivery of bogus drugs, and his connections to the prescribing providers and clinics:



186.    Claimant F.G. (claim no. 0658564539) was prescribed lidocaine 5% ointment and naproxen sodium tablets by non-party Inna Levtsenko, NP ("Levtsenko") at his initial visit on March 9, 2022 and lidocaine 5% ointment on April 5, 2022. F.G. testified that the lidocaine 5% ointment was given to him at the clinic. He also testified that "their pharmacy" (i.e., the clinic's choice of pharmacy) filled the prescriptions even though F.G. typically filled his prescriptions at a CVS pharmacy.

187.    First Class billed for naproxen sodium tablets and lidocaine 5% ointment purportedly delivered to F.G. on March 28, 2022 and May 16, 2022. Girenko initialed the delivery receipt for the medications, including lidocaine 5% ointment, purportedly delivered by First Class to F.G. at the clinic, which demonstrates both Girenko's direct involvement in the delivery of bogus drugs, and his connections to the prescribing providers and clinics:



188.    Claimant G.G. (claim no. 0667204481) was prescribed lidocaine 5% ointment, naproxen sodium tablets, and cyclobenzaprine tablets by Levtsenko at his initial visit on April 13, 2022 and again on May 25, 2022. G.G. testified that the medications were given to him at the clinic even though he hadn't "requested it at all."

189.    Girenko initialed the First Class delivery receipts for the medications, including lidocaine 5% ointment, purportedly delivered to G.G. at the clinic, which demonstrates both Girenko's direct involvement in the delivery of bogus drugs, and his connections to the prescribing providers and clinics:



190.    Overall, the Defendants caused the Pharmacy Defendants to seek No-Fault payments for drugs that were prescribed regardless of whether the claimants even wanted or needed the prescriptions.  The Defendants also forced claimants to obtain the drugs from the Pharmacy Defendants through direct deliveries, which were necessary because most claimants resided outside of the Bellerose neighborhood that the Pharmacy Defendants purported to serve.

### 4.    <u>Bogus Letters of Medical Necessity</u>

191.    The Defendants supported M&D's and TTC's No-Fault claims with boilerplate letters that were intended to establish the medical necessity of the billed-for drugs.  These so-called "letters of medical necessity" contain false statements because the prescriptions were not individualized to each patient's unique needs, and because the drugs were not actually necessary.

192.    The letters submitted to Allstate by M&D and TTC purportedly were authored by the prescribing providers and they contain identical or remarkably similar language.  The letters also cite the same sources using practically verbatim language to support the medical necessity of the prescribed drugs, particularly the Topical Pain Products.

193.    For example, M&D billed for diclofenac sodium 3% gel in connection with claimant L.S. (claim no. 0551750952).  The Defendants submitted a letter from non-party physician Mark Gladstein, M.D. ("Gladstein") dated December 5, 2019 in support of M&D's claim for topical diclofenac sodium 3% gel, which stated the following:

> **Diclofenac** is the first prescription topical treatment for pain that has been approved by the U.S. Food and Drug Administration. Diclofenac a non-steroidal anti-inflammatory drug or NSAID in topical form Diclofenac Gel delivers effective pain relief and has a favorable safety profile Diclofenac receives US Regulatory Approval as the First Approved Topical Prescription treatment for pain Clinical trials have demonstrated Diclofenac to be highly effective in treating pain Diclofenac delivers effective pain relief with a favorable safety profile as its systemic absorption is 94% less than the comparable oral Diclofenac treatment. (Rheological Study of Diclofenac Gel Containing Different Concentration of Carbapol 940 Trivedi Vishal*, Rathore R.P.S., Goyal Manish, Singh N. International Journal of Research in Pharmacy and Science)
>
> Diclofenac is popular, it has been in common topical use for well over a decade, and it is known to be effective.  Journal of Pain Research, Topical preparations for pain relief: efficacy and patient adherence, L.L. George, C.C. Feres, V. Teles et. Al. 201·I:4, 11-24. Diclofenac was found to be effective in treating acute musculoskeletal pain and has been approved for it. For painful musculoskeletal conditions topical Diclofenac preparations "can provide good levels of pain relief, without the systemic adverse events associated with oral NSAIDs". Journal of Pain Research, 17. (the patient had constant musculosketal pain in the neck, left shoulder, lower back, bilateral knees and left ankle)

194.    M&D also billed for diclofenac sodium 3% gel in connection with claimant S.S. (claim no. 0559777163).  This time, the Defendants submitted a letter from non-party physician Joseph Raia, M.D. ("Raia"), which stated the following:

> Diclofenac was the first prescription topical treatment for pain that has been approved by the U.S. Food and Drug Administration. Diclofenac a non-steroidal anti-inflammatory drug or NSAID in topical form Diclofenac Gel delivers effective pain relief and has a favorable safety profile Diclofenac receives US Regulatory Approval as the First Approved Topical Prescription treatment for pain Clinical trials have demonstrated Diclofenac to be highly effective in treating pain Diclofenac delivers effective pain relief with a favorable safety profile as its systemic absorption is 94% less than the comparable oral Diclofenac treatment. (Rheological Study of Diclofenac Gel Containing Different Concentration of Carbapol 940 Trivedi Vishal*, Rathore R.P.S., Goyal Manish, Singh N. International Journal of Research in Pharmacy and Science)

> Diclofenac, is popular, it has been in common topical use for well over a decade, and it is known to be effective.  Journal of Pain Research, Topical preparations for pain relief: efficacy and patient adherence, L.L. George, C.C. Feres, V. Teles et. Al. 2011:4, 11-24. Diclofenac was found to be effective in treating **acute musculoskeletal pain** and has been approved for it. For painful musculoskeletal conditions topical Diclofenac preparations "can provide good levels of pain relief, without the systemic adverse events associated with oral NSAIDs". Journal of Pain Research, 17.

195.    TTC billed for diclofenac sodium 3% gel in connection with claimant A.E. (claim no. 0610911315).  TTC submitted a letter from non-party Zilberman dated October 4, 2022 in support of TTC's claim for topical diclofenac sodium 3% gel, which contained the following passage identical to that in the rebuttals purportedly authored by Gladstein and Raia in support of M&D's charges for topical diclofenac sodium 3% gel:

I disagree with Dr. Kao, as Diclofenac is the first prescription topical treatment for pain that has been approved by the U.S. Food and Drug Administration (FDA). Diclofenac is a non-steroidal anti-inflammatory drug (NSAID) in topical form. Diclofenac gel delivers effective pain relief and has a favorable safety profile. Clinical trials have demonstrated Diclofenac to be highly effective in treatment for pain. Diclofenac delivers effective pain relief with a favorable safety profile as its systemic absorption is 94% less than the comparable oral Diclofenac treatment. *(Rheological Study of Diclofenac Gel Containing Different Concentration of Carbapol 940; Tiveldi Vishal, Rathore R.P.S., Goyal Manish, Singh N. International Journal of Research in Pharmacy and Science).* Diclofenac is popular, it has been in common topical use for well over a decade, and it is known to be effective. [Journal of Pain research, Topical preparations for pain relief: efficacy and patient adherence. L. L. George, C.C. Feres, V. Teles at al. 2011:4, 11-24]. Diclofenac was found to be effective in treating acute musculoskeletal pain and has been approved for it. For painful musculoskeletal conditions topical Diclofenac preparations "can provide good levels of pain relief."

196.    The Defendants also submitted bogus letters of medical necessity in support of M&D's bills for lidocaine 5% ointment.    Gladstein's letter for claimant L.S. (claim no. 0551750952) stated the following:

**Lidocaine** is substantially more potent at providing pain relief than many medications and, being topically applied, has additional advantages. Lidocaine has been successfully used to treat pain for many decades. It is powerful pain medication which is significantly more effective than OTC pain medication. Topical application has many advantages. Lidocaine has been found to be very

3

Patient: ▮▮▮▮▮▮▮
DOS:    8/19/2019

effective in treating both acute and chronic pain. Please refer to: J. Anesth Clin Res. 2017 Jan: 8(1): 697. Published online 2017 Jan 11. Lidocaine Infusion: A Promising Therapeutic Approach for Chronic Pain Enas Kandil et. al. Lidocaine is more effective at treating pain than most other agent including even some as powerful as opioids. Anesth. Pain Med. 2014 Feb: 4(1): e15444. Lidocaine and Pain Management in the Emergency Department: A Review Article, Samad EJ Golzari et. al. "The antinociceptive properties of Lidocaine are derived from multifaceted mechanisms, turning it into a medication that is safe to administer via different routes which makes it available for use in a variety of medical conditions." "Our study revealed that Lidocaine is broadly used in various therapeutic approaches for different types of pain"

197.    M&D's bills for lidocaine 5% ointment in connection with claimant O.T. (claim number 0552408972) were supported by a letter from non-party physician Ani Kalfayan, M.D. ("Kalfayan"), which contained language that was nearly identical to Gladstein's letter:

Lidocaine has been successfully used to treat pain for many decades. It is powerful pain medication which is significantly more effective than OTC pain medication. Topical application has many advantages. Lidocaine has been found to be very effective in treating both acute and chronic pain. Please refer to: J. Anesth Clin Res. 2017 Jan; 8(1): 697. Published online 2017 Jan 11. Lidocaine Infusion: A Promising Therapeutic Approach for Chronic Pain Enas Kandil et. al. Lidocaine is more effective at treating pain than most other agent including even some as powerful as opioids. Anesth. Pain Med. 2014 Feb; 4(1): e15444. Lidocaine and Pain Management in the Emergency Department: A Review Article, Samad EJ Golzari et. al. "The antinociceptive properties

3

Patient ██████████
DOS:    12/23/2019

of Lidocaine are derived from multifaceted mechanisms, turning it into a medication that is safe to administer via different routes which makes it available for use in a variety of medical conditions." "Our study revealed that Lidocaine is broadly used in various therapeutic approaches for different types of pain"

198.    Likewise, TTC's bill for lidocaine 5% ointment in connection with claimant B.L. (claim no. 0603821661) was supported by a letter from non-party Gladstein dated May 10, 2021, which contained the following language that was nearly identical to that used in letters submitted in support of M&D's claims for lidocaine 5% ointment:

Lidocaine has been successfully used to treat pain for many decades. It is a powerful pain medication which is significantly more effective than OTC pain medication. Topical application has many advantages. Lidocaine has been found to be very effective in treating both acute and chronic pain. Please refer to: J. Anesth Clin Res. 2017 Jan; 8(1): 697. Published online 2017 Jan 11. Lidocaine is more effective at treating pain than most other agent including even some as powerful as opioids. Anesth. Pain Med. 2014 Feb; 4(1): e15444. Lidocaine and Pain Management in the Emergency Department: A Review Article, Samad EJ Golzari et. al. "The antinociceptive properties of Lidocaine are derived from multifaceted mechanisms, turning it into a medication that is safe to administer via different routes which makes it available for use in a variety of medical

Name: B████ L██
DOS:  1/14/2021

conditions." "Our study revealed that Lidocaine is broadly used in various therapeutic approaches for different types of pain"

199.    The letters of medical necessity are not legitimate, and they demonstrate the Defendants' collusion with the prescribers to submit false and fraudulent No-Fault claims through M&D and TTC.

**5.    Unnecessary and Ineffective Drugs**

200.    The Pharmacy Defendants wrongfully billed for drugs that were medically unnecessary and not indicated for musculoskeletal injuries. The Topical Pain Products are ineffective for treating widespread pain in multiple areas of the body.

201.    Lidocaine 5% patches and ointment are not supported for use in patients with deep joint injuries (e.g., shoulder and spine injuries) or for patients with injuries in multiple areas, yet the Pharmacy Defendants routinely billed for lidocaine 5% patches and ointment ordered for such claimants.

202.    Topical lidocaine is designed to treat nerve pain.

203.    Lidocaine 5% ointment is FDA-approved for temporary relief of pain associated with minor burns, skin abrasions, and insect bites.

204.    Lidocaine 5% patches are FDA-approved for relief of pain associated with post-herpetic neuralgia (i.e., nerve pain after shingles).

205.    Using lidocaine 5% patches also raises the risk of lidocaine toxicity because the skin is continuously exposed to lidocaine; fatal side effects may occur if too much lidocaine is absorbed through the skin.

206.    Diclofenac sodium 3% gel is not effective or approved for the topical treatment of widespread musculoskeletal pain; it is only FDA-approved for the topical treatment of actinic keratosis, which is a skin condition caused by long-term sun exposure.  Using diclofenac sodium 3% gel in patients without actinic keratosis raises the risk of skin irritation, hypersensitivity, and photosensitivity.

207.    M&D's and TTC's repeated billing for diclofenac sodium 3% gel was harmful because the topical use of this drug was not indicated for the claimants' conditions.

208.    Even if prescription drugs were indicated, the Defendants still needlessly wasted No-Fault benefits because there were safer and less-costly alternatives available, which were ignored because the Pharmacy Defendants could not collect No-Fault payments for over-the-counter drugs.

209.    For example, the generic brand of diclofenac sodium 1% gel was a less-potent alternative in those select cases where topical diclofenac was warranted; however, the AWP for generic diclofenac sodium 1% gel (NDC No. 65162-0833-66) was less than $55.00 per 100-gram package.  Meanwhile, the generic diclofenac sodium 3% gel billed by M&D and TTC had an average AWP of approximately $1,179.00 per 100-gram package.

210.    There are many less costly alternatives to the Topical Pain Products, so the Defendants needed to ensure that specific drugs were ordered, which they accomplished through the use of pre-printed prescription order forms, which is against New York law.

211.    The drugs were prescribed early and often through predetermined protocols, which enabled the Pharmacy Defendants to submit a steady stream of demands for No-Fault payments.

212.    The Defendants' scheme wasted No-Fault benefits and put claimants at risk of harm from the overuse of unnecessary drugs.

a.    *Exemplar Claim—Claimant R.R. (claim no. 0597707470)*

213.    Claimant R.R. was reportedly involved in an automobile accident on August 24, 2020.

214.    On August 26, 2020, R.R. was examined by non-party physician Pak, who was working for non-party Metro Pain at a clinic located at 1100 Pelham Parkway in Bronx, NY, which is one of the clinics where Metro Pain providers followed a predetermined prescription protocol.

215.    Pak has a history of professional misconduct and has been disciplined by licensing boards in New Jersey and Pennsylvania.  Pak has also been accused of participating in other No-Fault schemes involving fraudulent prescriptions for medications and medical equipment.  *See Gov't Empls. Ins. Co. v. Wallegood Inc., et al.*, No. 1:21-cv-01986-PKC-RLM (E.D.N.Y.); *Liberty Mut. Ins. Co. v. AVK Rx Inc., et al.*, No. 2:22-cv-07329-GRB-SIL (E.D.N.Y.).  The allegations against Pak in *Wallegood* involve bogus prescriptions issued under Pak's name while working for Metro Pain.

216.    R.R. was prescribed cyclobenzaprine and lidocaine by Pak during the examination.  On August 31, 2020, M&D billed Allstate a total of $1,347.94 for the drugs prescribed by Pak.

217.    The drugs billed by M&D for R.R. were prescribed as part of predetermined protocols in which drugs, tests, and other services were prescribed for all Metro Pain patients regardless of medical need.

218.    In addition to prescription drugs, Pak also ordered urine drug testing ("UDT") for R.R., which was supposedly necessary for screening purposes before pain medication was prescribed.  This was false because the results of R.R.'s drug screen were not even reported until after M&D reportedly delivered the drugs to R.R.:

### Delivery—August 31, 2020



### UDT Reported—September 2, 2020



219.    Even if the drugs billed by M&D were necessary (they were not), the Defendants' actions still placed R.R. at a risk of harm by delivering and billing for the drugs before screening was complete.

220.    Allstate is entitled to recover all payments made to M&D in connection with these services.  To the extent that any of M&D's charges for the drugs for R.R. remain unpaid, Allstate has no further obligation to make payment because M&D's charges for R.R. are not compensable under New York's No-Fault laws.

**b.**    ***Exemplar Claim—Claimant J.D. (claim no. 0535565410)***

221.    Claimant J.D. was reportedly involved in an automobile accident on February 21, 2019.

222.    On March 4, 2019, J.D. was examined by a provider working at the 764 Elmont Road clinic, which is the same clinic implicated in a massive No-Fault fraud scheme.  *See United States v. Rose*, No. 19-cr-789 (S.D.N.Y.).  The scheme in *Rose* was conducted using bribes and stolen personal information to recruit patients for medical treatment and legal representation, who were then referred to providers and pharmacies that paid kickbacks.

223.     J.D. returned to the clinic for a re-examination on April 4, 2019 and was prescribed naproxen (oral NSAID), cyclobenzaprine, and diclofenac sodium 3% gel.

224.    M&D billed Allstate a total of $2,186.66 for the drugs prescribed to J.D.

225.    The drugs billed by M&D were prescribed because of a fraudulent predetermined protocol of treatment.  J.D. did not need the drugs, and there is evidence that J.D. was not even taking them.  J.D. was ordered to undergo UDT shortly after M&D billed for the drugs, and the

results showed no evidence of drugs in J.D.'s system; in fact, the drugs billed by M&D were not even listed among J.D.'s medications despite the prior prescriptions:



226.    Allstate is entitled to recover all payments made to M&D in connection with these services.  To the extent that any of M&D's charges for the drugs for J.D. remain unpaid, Allstate has no further obligation to make payment because M&D's charges for J.D. are not compensable under New York's No-Fault laws.

**c.    *Exemplar Claim—Claimant M.L. (claim no. 0529985920)***

227.    Claimant M.L. was reportedly involved in an automobile accident on December 20, 2018.

228.    M.L. was examined by non-party provider Augustus Igbokwe, PA ("Igbokwe"), who has been linked to other No-Fault fraud schemes. *See Liberty Mut. Ins. Co. v. AVK Rx Inc., et al.*, No. 2:22-cv-07329-GRB-SIL (E.D.N.Y.). At the initial visit on January 16, 2019, Igbokwe

prescribed medically unnecessary diclofenac sodium 3% gel to M.L. pursuant to a predetermined treatment protocol. Indeed, Igbokwe prescribed the diclofenac gel using an unsigned fax prescription and by circling from preprinted list of pre-ordained pain medications:

**MEDICATIONS**

-Cyclobenzaprine 5/10mg take 1 tablet every eight hours
-Meloxicam 15mg take 1 tablet daily
-Baclofen 20mg Take 1 tablet 3 times a day
-Gabapentin 100mg take 1 capsule three times a day
-Lidocaine 5% ointment apply 1-2 grams up to four times daily prn for pain
-Naproxen 550 1 tablet twice a day
-Diclofenac 3% gel apply to affected area twice daily

Case discussed with Mark Gladstein, MD

229.    On January 17, 2019, M&D billed Allstate $1,892.20 for the diclofenac sodium 3% gel prescribed to M.L.

230.    Igbokwe also started M.L. on a treatment protocol that included pain management injections performed at an ambulatory surgical center ("ASC").

231.    On April 8, 2019, M.L. reportedly underwent a pain management injection performed by non-party Gladstein at an ASC in New Jersey. Gladstein purportedly prescribed naproxen, baclofen, and diclofenac sodium 3% gel for M.L.

232.    On April 8, 2019, M&D billed Allstate a total of $1,488.37 for the drugs prescribed to M.L.

233.    The drugs billed by M&D were prescribed because of a fraudulent predetermined protocol of treatment. There is no evidence or indication that M.L. needed the drugs; in fact, the prescriptions were ordered at 7:33am, which was before Gladstein even completed the procedure:

63



234. On July 16, 2019, M&D billed Allstate $1,224.04 for another unnecessary Topical Pain Product, this time, lidocaine 5% ointment, prescribed to M.L. by Kalfayan.

235. Kalfayan steered the prescription for the lidocaine 5% ointment to M&D even though Kalfayan purportedly treated M.L. in Spring Valley, NY—where M.L. also resided—which is over 40 miles from M&D's Bellerose location.

236. Allstate made payments to M&D totaling $6,987.39 in connection with the fraudulent records and bills submitted in connection with M.L.

237. Allstate is entitled to recover all payments made to M&D in connection with these services. To the extent that any of M&D's charges for the drugs for M.L. remain unpaid, Allstate has no further obligation to make payment because M&D's charges for M.L. are not compensable under New York's No-Fault laws.

**d.    *Exemplar Claim—Claimant A.C. (claim no. 0487717472)***

238. Claimant A.C. was purportedly involved in an automobile accident on January 6, 2018.

239.    Thereafter, A.C. started treating at the 764 Elmont Road clinic, and was eventually referred to non-party Gladstein for treatment.  Gladstein prescribed cyclobenzaprine and lidocaine 5% ointment for A.C. during an office visit on March 27, 2018.

240.    On March 28, 2018, M&D billed Allstate a total of $735.58 for the drugs prescribed to A.C.

241.    The drugs billed by M&D were prescribed because of a fraudulent predetermined protocol of treatment in which claimants received pain medication regardless of medical need.

242.    Even if the drugs were necessary (they were not), there is evidence that A.C. was not even taking the medications.  On April 4, 2019, A.C. was ordered to undergo UDT by a different provider working at the 764 Elmont Road clinic.  Notably, the results of the UDT reported no evidence of cyclobenzaprine in A.C.'s system, which means that A.C. was not taking the drugs billed for by M&D:



243.    Allstate paid M&D $738.58 in reliance on the fraudulent records and bills submitted in connection with A.C.

244. Allstate is entitled to recover all payments made to M&D in connection with these services. To the extent that any of M&D's charges for the drugs for A.C. remain unpaid, Allstate has no further obligation to make payment because M&D's charges for A.C. are not compensable under New York's No-Fault laws.

### e.    *Exemplar Claim—Claimant E.V. (claim no. 0576449219)*

245. Patient E.V. was purportedly involved in a motor vehicle accident on January 27, 2020.

246. E.V. was examined on February 5, 2020, for reported complaints of pain to the neck, lower back, right shoulder, and left knee.

247. Despite a lack of any documented contra-indication to oral anti-inflammatories, E.V. was prescribed with 200 grams of diclofenac sodium 3% gel and a thirty day supply of lidocaine 5% patches at the initial evaluation within two weeks of the alleged motor vehicle accident without affording E.V. any opportunity to first attempt conservative care.

248. There is no documentation that E.V. suffered from actinic keratosis, the skin condition for which diclofenac sodium 3% gel is FDA-approved, which condition would not be causally related to the underlying motor vehicle accident.

249. There is no documentation that E.V. suffered from a neurological condition associated with shingles (i.e., post-herpetic neuralgia) that may be treated with lidocaine patches.

250. The diclofenac sodium 3% gel and lidocaine 5% patches were not medically necessary or indicated to treat E.V.'s musculoskeletal injuries, and there is no medical justification for the topical use of these medications as part of E.V.'s treatment plan.

251. M&D billed Allstate a total of $2,041.32 for 200 grams of the diclofenac sodium 3% gel (NDC No. 00115-1483-61) and thirty lidocaine 5% patches (NDC No. 00591-3525-30) for E.V.

252. E.V.'s neck, lower back, shoulder, and knee pain reportedly continued at essentially the same level as when the topical medications were initially prescribed on February 5, 2020.

253. Thus, the diclofenac sodium 3% gel and lidocaine 5% patches were prescribed to E.V. as part of a predetermined protocol given that E.V.'s condition and complaints of pain to his neck, lower back, shoulder, and knee simply did not warrant the prescription of the Topical Pain Products because these products are not effective topically to treat pain to multiple areas or deep musculoskeletal and joint pain of the spine and shoulder.

254. Allstate is entitled to recover all payments made to M&D in connection with these services. To the extent that any of M&D's charges for the drugs for E.V. remain unpaid, Allstate has no further obligation to make payment because M&D's charges for E.V. are not compensable under New York's No-Fault laws.

### f.   *Exemplar Claim—Claimant P.R. (claim no. 0563596732)*

255. Claimant P.R. was purportedly involved in a motor vehicle accident on October 3, 2019.

256. On October 7, 2019, P.R. started treating with Metro Pain, which was operating from a clinic located at 1100 Pelham Parkway in Bronx, NY.

257. The clinic at 1100 Pelham Parkway was identified by Alleyne as one of the clinics where Metro Pain followed a predetermined prescription protocol for all patients.

258.    P.R. was purportedly prescribed cyclobenzaprine and lidocaine 5% ointment following the October 7, 2019 initial examination with Metro Pain.

259.    P.R.'s prescriptions were reportedly transmitted to TTC by facsimile, which is against New York law because, even if an exception to the electronic prescription requirement applied (it did not), the prescriptions were not manually signed by the prescriber or on an official New York State prescription form:

 

260.    TTC billed Allstate a total of $1,302.66 for the drugs prescribed to P.R.

261.    TTC's bills are fraudulent because the drugs were ordered as part of a predetermined treatment protocol.

262.    TTC's bills are also fraudulent because Metro Pain's report of P.R.'s initial examination does not indicate a prescription for cyclobenzaprine, and the drugs are not supported by valid prescriptions:



263.     Allstate paid TTC $1,352.66 in reliance on the fraudulent records and bills submitted in connection with P.R.

264.     Allstate is entitled to recover all payments made to TTC in connection with these services.  To the extent that any of TTC's charges for the drugs for P.R. remain unpaid, Allstate has no further obligation to make payment because TTC's charges for P.R. are not compensable under New York's No-Fault laws.

g.      *Exemplar Claim—Claimant S.H. (claim no. 0580201614)*

265.     Claimant S.H. was purportedly involved in a motor vehicle accident on March 2, 2020.

266.     Days later, S.H. began treating with medical providers at a clinic located at 240-19 Jamaica Avenue in Queens, NY.

267.     S.H. was purportedly examined by non-party Raia.

268.     Raia has a history of involvement in other fraud schemes. *Gov't Empls. Ins. Co. v. Prescott, et al.*, No. 1:14-cv-00057-BMC (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Della Badia, et al.*, No. 1:13-cv-01720-CBA-VMS (E.D.N.Y.).

269.     Raia was accused of billing for services not rendered, and submitting claims for false or fraudulent medical services.

270.     Raia was also involved in intercepted conversations with non-party Nathaniel Coles a/k/a "Nat" ("Coles") about operating illegal medical clinics.  Coles and others were prosecuted for using bribes and stolen personal information to contact and recruit patients who were subjected to unnecessary treatments and prescriptions, which yielded an enormous volume of billing for medical providers and pharmacies. *United States v. Rose*, No. 19-cr-00789-PGG (S.D.N.Y.).

271.    Raia purportedly prescribed naproxen, cyclobenzaprine, and esomeprazole for S.H. on December 30, 2020.  Notably, Raia's examination report does not include orders for these drugs.

272.    The drugs were reportedly delivered to S.H. on January 13, 2021.

273.    TTC billed Allstate a total of $334.47 for the drugs prescribed to S.H.

274.    TTC's bills are fraudulent because the drugs were ordered as part of a predetermined treatment protocol.

275.    Allstate paid TTC $329.47 in reliance on the fraudulent records and bills submitted in connection with S.H.

276.    Allstate is entitled to recover all payments made to TTC in connection with these services.  To the extent that any of TTC's charges for the drugs for S.H. remain unpaid, Allstate has no further obligation to make payment because TTC's charges for S.H. are not compensable under New York's No-Fault laws.

> **h.    *Exemplar Claims—Claimants D.V. (claim no. 0551215775) and H.K. (claim no. 0551215775)***

277.    Claimants D.V. and H.K. purportedly were involved in the same motor vehicle accident on June 27, 2019.

278.    Both D.V. and H.K. underwent an initial evaluation with Gladstein's physician assistant on August 29, 2019 for complaints of neck, low back, and left shoulder pain (D.V.) and neck and low back pain (H.K.).

279.    D.V. was prescribed cyclobenzaprine tablets, naproxen tablets, and diclofenac sodium 3% gel pursuant to a predetermined treatment protocol even though the diclofenac sodium 3% gel was not indicated to treat musculoskeletal pain of the shoulder and spine:



280.    Similarly, H.K. also was prescribed cyclobenzaprine tablets and diclofenac sodium 3% gel pursuant to a predetermined treatment protocol even though the diclofenac sodium 3% gel was not indicated to treat musculoskeletal pain of the spine:

**MEDICATIONS**

-Cyclobenzaprine 5/10mg take 1 tablet every eight hours
-Meloxicam 15mg take 1 tablet daily
-Baclofen 20mg Take 1 tablet 3 times a day
-Gabapentin 100mg take 1 capsule three times a day
-Lidocaine 5% ointment apply 1-2 grams up to four times daily prn for pain
-Naproxen 550 1 tablet twice a day
-Diclofenac 3% gel apply to affected area twice daily

Case discussed with Mark Gladstein, MD

281.    M&D reportedly delivered the drugs to D.V. and H.K. on September 4, 2019.

282.    M&D billed Allstate a total of $2,186.66 for the drugs prescribed to D.V. and $2,016.26 for the drugs prescribed to H.K.

283.    Allstate paid M&D $4,320.37 in reliance on the fraudulent records and bills submitted in connection with D.V. and H.K.

284.    Less than 3 weeks later, on September 23, 2019, another provider with QR Medical Services P.C. prescribed both D.V. and H.K. with more cyclobenzaprine tablets, ibuprofen tablets, and diclofenac sodium 3% gel. Even if these medications were medically necessary to treat D.V.'s and H.K.'s complaints of musculoskeletal pain (they were not), D.V.

and H.K. did not need more such medications.  QR Medical Services P.C. has been accused of being used to submit false and fraudulent bills under New York's No-Fault laws pursuant to a predetermined treatment protocol and unlawful referral relationships. *See Liberty Mut. Ins. Co. v. Eldar Kadymoff Medical, P.C.*, No. 2:20-cv-02293-PKC-CLP (E.D.N.Y.).

285.    The nearly identical medications prescribed to D.V. and H.K., including 2 prescriptions each for unnecessary and ineffective diclofenac sodium 3% gel, illustrate that the medications were prescribed pursuant to a predetermined protocol rather than individualized treatment plans.

286.    On September 26, 2019, TTC billed Allstate $1,999.62 for the drugs prescribed to D.V. and $1,990.35 for the drugs prescribed to H.K.

287.    Allstate paid TTC a total of $4,005.93 in reliance on the fraudulent records and bills submitted in connection with D.V. and H.K.

288.    Allstate is entitled to recover all payments made to M&D and TTC in connection with these services.  To the extent that any of M&D and TTC's charges for the drugs for D.V. and H.K. remain unpaid, Allstate has no further obligation to make payment because M&D's and TTC's charges for D.V. and H.K. are not compensable under New York's No-Fault laws.

   i.    *Exemplar Claim—Claimant M.E. (claim no. 0553241159)*

289.    Claimant M.E. purportedly was involved in a motor vehicle accident on July 15, 2019.

290.    M.E. was examined by Gladstein's physician assistant on August 22, 2019 for complaints of neck and low back pain.

291.    M.E. was prescribed cyclobenzaprine tablets, naproxen tablets, and diclofenac sodium 3% gel pursuant to the same predetermined treatment protocol imposed on other of

Gladstein's patients even though the diclofenac sodium 3% gel was not indicated to treat musculoskeletal pain of the shoulder and spine:



292.    M&D reportedly delivered the drugs to M.E. on August 27, 2019.

293.    M&D billed Allstate a total of $2,186.66 for the drugs prescribed to M.E.

294.    M.E. was re-examined by a nurse practitioner for Gladstein, Zilberman, on December 12, 2019.

295.    However, despite previously being prescribed 3 separate medications by a provider in the same office, including diclofenac sodium 3% gel, the report of this examination only indicates that M.E. was taking ibuprofen.

296.    Nonetheless, Zilberman again prescribed M.E. with cyclobenzaprine and diclofenac sodium 3% gel pursuant to the same predetermined protocol without regard for whether these medications were effective to treat M.E.'s complaints of musculoskeletal pain (they were not):

**MEDICATIONS**
-Cyclobenzaprine 5/10mg take 1 tablet every eight hours
-Meloxicam 15mg take 1 tablet daily
-Baclofen 20mg Take 1 tablet 3 times a day
-Gabapentin 100mg take 1 capsule three times a day
-Lidocaine 5% ointment apply 1-2 grams up to four times daily prn for pain
-Naproxen 550 1 tablet twice a day
-Diclofenac 3% gel apply to affected area twice daily

Discussed with Mark Gladstein, MD

297.     TTC reportedly delivered the drugs to M.E. on December 19, 2019.

298.     TTC billed Allstate a total of $2,016.26 for the drugs prescribed to M.E.

299.     Allstate paid TTC $25.82 in reliance on the fraudulent records and bills submitted in connection with M.E.

300.     Allstate is entitled to recover all payments made to M&D and TTC in connection with these services.  To the extent that any of M&D and TTC's charges for the drugs for M.E. remain unpaid, Allstate has no further obligation to make payment because M&D's and TTC's charges for M.E. are not compensable under New York's No-Fault laws.

**j.     *Exemplar Claim—M.L. (claim no. 0557209814)***

301.     Claimant M.L. purportedly was involved in a motor vehicle accident on August 14, 2019.

302.     On August 29, 2019, M.L. underwent an initial examination with Zilberman for complaints of neck, low back, and left knee pain.

303.     Zilberman prescribed medications for M.L. by choosing from a preprinted list of medications in the examination report, including cyclobenzaprine, gabapentin, and diclofenac sodium 3% gel:



304.    Zilberman's prescriptions for M.L. purportedly were transmitted to M&D by facsimile, which prescriptions actually represented unsigned copies.

305.    M&D purportedly delivered the cyclobenzaprine, gabapentin, and diclofenac sodium 3% gel to M.L. for which M&D billed Allstate a total of $2,059.64.

306.    Zilberman prescribed baclofen tablets and gabapentin tablets for M.L. on November 7, 2019, but this time transmitted the prescriptions, again through unsigned copies submitted via facsimile, to TTC, which had just become a registered pharmacy on September 12, 2019, even though M&D was still operational.

307.    TTC purportedly delivered the gabapentin and baclofen to M.L. on November 15, 2019 for which TTC billed Allstate $555.07.

308.    However, there is evidence that M.L. did not need—or did not even receive—the gabapentin because less than one month later, on December 9, 2019, M.L. underwent urine drug testing, the results of which did not report any prescribed medications and were negative for gabapentin:

◇**TOPLAB**

Laboratory Report

Final Copy
Confidential – Laboratory Report

67-71 EAST WILLOW STREET
MILBURN, NJ 07041

Lab Director: Ayad Mudarris
Tel#: (877)355-3580
Fax#: (866)899-3995
CLIA Number: 31D2135687

**Client Information:**
Client:    Albert Graziosa
3611A East Tremont Ave
BRONX, NY 10465
**Requesting Physician:**
Graziosa, Albert

**Patient Information:**
Patient Name:
Patient ID:
Date of Birth:
Male/Female:    Female
Fasting:    NO

**Sample Information:**
Lab Sample ID: 1912100003
Collected:    12/09/2019 05:11 AM
Received:    12/10/2019 05:11 AM
Reported:    12/11/2019 02:26 PM

PRESCRIBED MEDICATION:

**CONSISTENT POSITIVE – RESULTS CORRELATE WITH REPORTED CLINICAL HISTORY**

| Reported Medication(s) | Anticipated Positive | Amount Detected | Cutoff | Outcome | Comments |
|---|---|---|---|---|---|
| None | | | | | |

**********

| QUANTITATIVE RESULTS by LC-MS/MS | | | | |
| Test | Result | Value | Cutoff | Interpretation |
| --- | --- | --- | --- | --- |
| **ANAGESICS** | | | | |
| Acetaminophen | POSITIVE | >5000 | 500 ng/mL | INCONSISTENT |
| **ANTICONVULSANTS** | | | | |
| Gabapentin | Negative | | 200 ng/mL | |
| Pregabalin | Negative | | 200 ng/mL | |

309.    On January 9, 2020, Zilberman again prescribed M.L. with baclofen and gabapentin, along with a new prescription for lidocaine 5% ointment, which prescriptions again were transmitted as unsigned copies via facsimile to TTC.

310.    TTC billed Allstate $1,774.11 for these medications for M.L. on January 13, 2020.

311.    Allstate made payments to M&D totaling $4,193.62 in connection with the fraudulent records and bills submitted in connection with M.L.

312.    Allstate also made payments to TTC totaling $1,436.95 in connection with the fraudulent records and bills submitted in connection with M.L.

313.    Allstate is entitled to recover all payments made to M&D and TTC in connection with these services.  To the extent that any of M&D and TTC's charges for the drugs for M.L. remain unpaid, Allstate has no further obligation to make payment because M&D's and TTC's charges for M.L. are not compensable under New York's No-Fault laws.

**k.    *Exemplar Claims—Claimants T.F. (claim no. 0650560105) and S.F. (claim no. 0650560105)***

314.    Claimants T.F. and S.F. purportedly were involved in a motor vehicle accident on November 20, 2021.

315.    On November 29, 2021, T.F. and S.F. were initially examined at Tri-borough by Rampershad at a clinic located at 1975 Linden Blvd, Elmont, NY.

316. The clinic at 1975 Linden Boulevard has been implicated in numerous No-Fault schemes during the relevant period.

317. At this initial evaluation, Rampershad prescribed T.F. with a predetermined protocol of naproxen, cyclobenzaprine, and lidocaine 5% ointment.

318. Likewise, Rampershad also prescribed S.F. with lidocaine 5% ointment and cyclobenzaprine at the initial examination.

319. These medications purportedly were dispensed to T.F. and S.F. by a non-party pharmacy.

320. On January 12, 2022, T.F. and S.F. were re-examined by Gaetan at Tri-borough, but even though T.F. and S.F. purportedly already were dispensed medications, including unnecessary and ineffective lidocaine 5% ointment, Gaetan reported "none" for medications taken by T.F. and "does not remember" for medications taken by S.F.

321. Gaetan again prescribed T.F. with the same 3 medications, including lidocaine 5% ointment and S.F. with the same 2 medications, including lidocaine 5% ointment.

322. A different non-party pharmacy purportedly dispensed these medications to T.F. and S.F.

323. On March 2, 2022, T.F. again was re-examined by Gaetan at Tri-borough and again was reported to be taking no medications despite Gaetan's previous prescriptions for T.F., including unnecessary lidocaine 5% ointment:

| TRI-BOROUGH NY MEDICAL PRACTICE PC (1975 Linden Blvd Elmont NY 11003) | | |
|---|---|---|
| Patient Name: T████K F████ | DOB: ████████ | Sex: Male |
| Doctor: Gaetan R Jean Marie | Visit: 03/02/2022 | DOA: 11/20/2021 |
| Medications: None | | |

324.    Likewise, S.F. again was re-examined by Gaetan at Tri-borough and again was reported to "not remember" medications taken despite Gaetan's previous prescriptions for S.F., including unnecessary lidocaine 5% ointment:

**TRI-BOROUGH NY MEDICAL PRACTICE PC (1975 Linden Blvd Elmont NY 11003)**

| Patient Name: S▮▮▮▮▮ ▮ | DOB: 03/13/1962 | Sex: Female |
|---|---|---|
| Doctor: Gaetan R Jean Marie | Visit: 03/02/2022 | DOA: 11/20/2021 |

Allergies: None or NKA
Medications: Does not remember

325.    Gaetan again prescribed the same three predetermined medications to T.F. and the same two predetermined medications to S.F. without any consideration for whether these same medications had been effective for claimants or if they were even using the medications.  This time, First Class purportedly dispensed these medications, including lidocaine 5% ointment, to T.F. and S.F. on March 14, 2022.

326.    However, even though Gaetan's report identified lidocaine 5% ointment and cyclobenzaprine as being prescribed for S.F., Gaetan actually duplicated the prescription regimen for T.F. and prescribed naproxen for S.F. as well.

**TRI-BOROUGH NY MEDICAL PRACTICE PC (1975 Linden Blvd Elmont NY 11003)**

| Patient Name: S▮▮▮W F | DOB: | Sex: Female |
|---|---|---|
| Doctor: Gaetan R Jean Marie | Visit: 03/02/2022 | DOA: 11/20/2021 |

**GAIT PATTERNS**

| | Left | Right |
|---|---|---|
| Antalgic (reduce stance phase) | negative | negative |

**CERVICAL MUSCLES:**

**Neurological Exam**

Gait Exam: normal

**Prescriptions**

Medications Prescribed:

Lidocaine (5%) - 250 Grams Ointment

Other - cyclobenzaprine 10 mg take 1 tab daily #30

Note: medications and supply prescriptions done on paper



327.    Tri-borough and the prescribing providers steered the prescriptions for identical medications to three separate pharmacies, including First Class, to conceal the volume of billing for the medically unnecessary medications, including an ineffective Topical Pain Product, and to maintain unlawful referral relationships with multiple pharmacies.

328.    First Class billed Allstate a total of $1,648.76 each for the drugs prescribed to T.F. and S.F.

329.    Allstate paid First Class $1,633.76 in reliance on the fraudulent records and bills submitted in connection with T.F.

330.    Allstate paid First Class $1,633.76 in reliance on the fraudulent records and bills submitted in connection with S.F.

331.    Allstate is entitled to recover all payments made to First Class in connection with these services.  To the extent that any of First Class's charges for the drugs for T.F. and S.F. remain unpaid, Allstate has no further obligation to make payment because First Class's charges for T.F. and S.F. are not compensable under New York's No-Fault laws.

**l.** ***Exemplar Claims—Claimants G.P. (claim no. 0667204481) and G.G. (claim no. 0667204481)***

332.    Claimants G.P. and G.G. purportedly were involved in a motor vehicle accident on April 8, 2022.

333.    On April 13, 2022, G.P. and G.G. both were initially examined by Levtsenko at a clinic located at 3209 Fulton Street, Brooklyn, NY for complaints of pain to the lower back, neck, and left foot and lower back, neck, and right shoulder, respectively.

334.    The clinic at 3209 Fulton Street has been implicated in numerous No-Fault schemes during the relevant period.

335.    At this initial visit, Levtsenko prescribed G.P. and G.G. with an identical standard protocol of medications consisting of cyclobenzaprine, naproxen, and lidocaine 5% ointment.

336.    First Class purportedly delivered these unnecessary medications to G.P. and G.G. on April 27, 2022.

337.    Levtsenko re-examined G.P. and G.G. on May 25, 2022, but did not report any meaningful findings regarding whether these claimants were taking the prescribed medications or whether they were effective.

338.    Nonetheless, Levtsenko refilled the cyclobenzaprine, naproxen, and lidocaine 5% ointment for G.P. and G.G. as a matter of course, which medications again purportedly were dispensed by First Class on June 13, 2022 and June 9, 2022, respectively.

339.    Levtsenko again refilled these same 3 medications for G.P. and G.G.—without any discussion of their efficacy or any side effects experienced by G.P. and G.G.—but steered the prescriptions to another pharmacy to conceal the volume of prescriptions for unnecessary medications, including ineffective Topical Pain Products, funneled to First Class.

340.    First Class billed Allstate a total of $3,301.12 each for the drugs prescribed to G.P. and G.G.

341.    Allstate is entitled to recover all payments made to First Class in connection with these services.  To the extent that any of First Class's charges for the drugs for G.P. and G.G. remain unpaid, Allstate has no further obligation to make payment because First Class's charges for G.P. and G.G. are not compensable under New York's No-Fault laws.

**m.    *Exemplar Claim—Claimant M.C. (claim no. 0657948501)***

342.    Claimant M.C. purportedly was involved in a motor vehicle accident on February 3, 2022.

343.    M.C. was initially evaluated by Gaetan at Tri-borough's clinic located at 1975 Linden Blvd, Elmont, NY on March 7, 2022 for complaints of pain to the neck, left hand, bilateral knees, and bilateral shoulders.

344.    At the initial evaluation, Gaetan prescribed M.C. with a predetermined trio of medications (i.e., naproxen, cyclobenzaprine, and lidocaine 5% ointment) and steered the prescriptions to First Class.

345.    First Class purportedly dispensed these medications to M.C. on March 22, 2022.

346.    On May 23, 2022, M.C. underwent another initial examination with Phelan Clancy, NP ("Clancy") at the clinic at 1975 Linden Blvd.

347.    Clancy allegedly has "stated under oath that she resigned from the Clinic located at 1975 Linden Boulevard, Elmont after discovering, among other things, that her name license, and tax identification number were being used to bill for services that she never performed, authorized, or supervised; that a stamped, forged and/or unauthorized copy of her signature was used to issue referrals for healthcare goods without her knowledge or consent; and that there was

a written list on the wall at the Clinic that outlined the required prescribing/referral protocol and the quotas that had to be met." *Gov't Empls. Ins. Co. v. Chai Diagnostics LLC*, No. 1:24-cv-02704 (E.D.N.Y.); *see also Gov't Empls. Ins. Co. v. Family Rx Corp.*, No. 1:23-cv-07291 (E.D.N.Y.) (alleging that Clancy also stated under oath that the clinic manager at 1975 Linden Blvd "told her about the need to prescribe Lidocaine 5% Ointment to every patient" and that he "chose which pharmacy was sent the prescriptions").

348.    Despite the previous prescriptions for cyclobenzaprine, naproxen, and lidocaine 5% ointment, none of these medications are identified in Clancy's report so their efficacy, side effects, or whether M.C. was even taking them are unknown.

349.    Nonetheless, Clancy again prescribed the same 3 medications for M.C. and steered these prescriptions to First Class, which purportedly delivered the medications to M.C. on June 1, 2022.

350.    Clancy re-examined M.C. on June 22, 2022 at the clinic located at 1975 Linden Blvd.; the report of this examination again does not meaningfully discuss the medications, including the Topical Pain Product, prescribed to M.C., including their efficacy, side effects, or whether M.C. was taking the medications.

351.    However, Clancy again refilled the cyclobenzaprine, naproxen, and lidocaine 5% ointment for M.C. and steered these prescriptions to First Class, which purportedly delivered the medications to M.C. on June 30, 2022.

352.    First Class billed Allstate a total of $4,948.08 for the drugs prescribed to M.C.

353.    Allstate made payments to First Class totaling $4,199.88 in connection with the fraudulent records and bills submitted in connection with M.C.

354.    Allstate is entitled to recover all payments made to First Class in connection with these services.  To the extent that any of First Class's charges for the drugs for M.C. remain unpaid, Allstate has no further obligation to make payment because First Class's charges for M.C. are not compensable under New York's No-Fault laws.

D.    **FRAUDULENT BILLING**

355.    M&D and TTC billed Allstate for generic Topical Pain Products in excess of the amounts permitted under the applicable fee schedule to further inflate M&D's and TTC's bills for these medically unnecessary Topical Pain Products.

356.    M&D's bills were excessive because they failed to deduct the required 20% of the AWP from the charges for generic medications, including Topical Pain Products.

357.    Below are representative examples of M&D's practice of overbilling Allstate for generic Topical Pain Products:

| Claimant | Date of Service | Description | NDC | AWP | M&D Charge | Permissible Charge |
|---|---|---|---|---|---|---|
| J.Q. (claim no. 0446153181) | 1/10/18 | Lidocaine 5% ointment 100g | 52565-0008-55 | $380.93 (100g) | $761.86 | $609.49 |
| B.T. (claim no. 0452325814) | 2/8/18 | Lidocaine 5% ointment 100g | 68462-0418-27 | $380.93 (100g) | $761.90 | $609.49 |
| M.W. (claim no. 0456898831) | 12/19/17 | Lidocaine 5% patch (30) | 00591-3525-30 | $280.81 (30) | $280.80 | $224.65 |
| D.W. (claim no. 0462993395) | 1/25/18 | Lidocaine 5% ointment 100g | 52565-0008-55 | $380.93 (100g) | $761.86 | $609.49 |

| Claimant | Date of Service | Description | NDC | AWP | M&D Charge | Permissible Charge |
|----------|-----------------|-------------|-----|-----|------------|--------------------|
| T.B. (claim no. 0468680418) | 2/8/18 | Lidocaine 5% ointment 100g | 52565-0008-55 | $380.93 (100g) | $761.86 | $609.49 |
| T.M. (claim no. 0473006898) | 2/21/18 | Diclofenac sodium 3% gel 100g | 68462-0355-94 | $1,179.46 (100g) | $1,179.50 | $943.57 |
| K.M. (claim no. 477217749) | 1/15/18 | Lidocaine 5% ointment 100g | 52565-0008-55 | $380.93 (100g) | $761.86 | $609.49 |
| B.G. (claim no. 0479112930) | 1/25/18 | Lidocaine 5% ointment 100g | 51672-3008-03 | $380.93 (100g) | $761.90 | $609.49 |
| L.G. (claim no. 0479112930) | 1/25/18 | Lidocaine 5% ointment 100g | 51672-3008-03 | $380.93 (100g) | $761.90 | $609.49 |
| O.S. (claim no. 0481937829) | 3/1/18 | Diclofenac sodium 3% gel 100g | 00168-0844-01 | $1,179.46 (100g) | $1,179.50 | $943.57 |

358.    TTC also repeatedly misrepresented its charges for diclofenac sodium 3% gel under NDC 51672-1363-07 to demand more than permitted under the applicable Fee Schedule for this Topical Pain Product.

359.    Specifically, diclofenac sodium 3% gel under NDC 51672-1363-07 has an AWP of $111.56 per 100 gram package. Therefore, for 200 grams of diclofenac sodium 3% gel under NDC 51672-1363-07, TTC would only be able to charge $178.50 after the required 20% deduction.

360.    However, TTC billed a total of $1,887.20 for 200 grams of diclofenac sodium 3% gel under NDC 51672-1363-07 for claimants such as C.H. (claim no. 0591018809):

| 15. Report of services rendered | | | | | |
|---|---|---|---|---|---|
| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Modifier | Charges |
| 07/09/2020 | 248-47 JERICHO TURNPIKE BELLEROSE, NY 11426 | DISPENSING FEE | S9430 | | $ 5.00 |
| 07/09/2020 | 0 | CYCLOBENZAPRINE 5 MG TAB 90 | NDC 10702-0006-10 | | $ 124.06 |
| 07/09/2020 | 0 | DICLOFENAC SODIUM 3% GEL 200 gm | NDC 51672-1363-07 | | $ 1887.20 |
| | | | TOTAL CHARGES TO DATE | | $ 2016.26 |

361.    Therefore, TTC falsely represented that diclofenac sodium 3% gel under NDC 51672-1363-07 has an AWP of $1,179.46, which is not accurate. Rather, diclofenac sodium 3% gel under NDC 71085-0003-00 and NDC 68462-0355-94, for example, have an AWP of $1,179.46.

362.    Below are further representative examples of TTC's inflated and misrepresented charges for 200 grams of diclofenac sodium 3% gel under NDC 51672-1363-07:

| Claimant | Date of Service | NDC | Description | Amount Charged | Permissible Charge Under Fee Schedule |
|---|---|---|---|---|---|
| C.M. (claim no. 0585432271) | 6/18/2020 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |
| A.E. (claim no. 0610911315) | 1/7/2021 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |
| R.C. (claim no. 0596979476) | 1/7/2021 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |
| C.L. (claim no. 0596979476) | 1/7/2021 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |

| Claimant | Date of Service | NDC | Description | Amount Charged | Permissible Charge Under Fee Schedule |
|---|---|---|---|---|---|
| S.L. (claim no. 0597569599) | 12/16/2020 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |
| B.Y. (claim no. 0605854637) | 12/9/2020 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |
| E.R. (claim no. 0557841814) | 1/15/2020 | 51672-1363-07 | Diclofenac sodium 3% gel 100gm | $943.60 | $89.25 |
| L.P. (claim no. 0573228509) | 5/12/2020 | 51672-1363-07 | Diclofenac sodium 3% gel 200gm | $1,887.20 | $178.50 |

363.    M&D's and TTC's charges in violation of the applicable fee schedule were fraudulent and not reimbursable under New York's No-Fault laws.

### E. VIOLATION OF PHARMACY LICENSING REGULATIONS

364.    Pharmacists and their interns have a duty under New York law to conduct a review before each medication is dispensed or delivered to the patient to avoid therapeutic duplication and drug-drug interactions that may cause drug therapy problems and harm the patient. 8 N.Y.C.R.R. § 63.6(b)(7).

365.    Using their professional judgment, a pharmacist or pharmacy intern may refuse to dispense a medication that could endanger the health of the patient through "potential adverse effects, interactions or other therapeutic complications." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(e) and § 63.6(b)(8)(ii)(d)(5).

366.    For a drug or medication that is delivered on the pharmacy's premises, before dispensing a medication to a new patient or a new medication to an existing patient, the

pharmacist or pharmacy intern must personally counsel the patient by telephone or in person on appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications. 8 N.Y.C.R.R. § 63.6(b)(8)(a)-(b).

367.    For a drug or medication that is delivered off of pharmacy premises, if the pharmacist or pharmacy intern "determines that there are potential drug therapy problems which could endanger the health of a patient," the pharmacist or pharmacy intern must personally contact the patient prior to dispensing the medication by telephone or in person to offer counseling on the identified potential problems and any other appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications. 8 N.Y.C.R.R. § 63.3(b)(8)(ii)(d)(1).

368.    The responsibility of offering counseling to patients in these situations "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit." 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(2).

369.    If the patient refuses to accept counseling, such refusal must be documented.  8 N.Y.C.R.R. § 63.6(b)(8)(c); 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

370.    Claimants were given prescriptions for topical diclofenac or lidocaine, in addition to oral NSAIDs such as naproxen and meloxicam.  These drugs may cause harmful side-effects, including damage to the intestines, the lining of the stomach, and other serious medical problems.  When taken together, topical NSAIDs (e.g., diclofenac) and oral NSAIDs (e.g., naproxen) can cause harmful side-effects.

371.    As part of this scheme, claimants were ordered to take oral and topical NSAIDs without properly considering the potential hazardous effects.

372.    M&D and TTC dispensed patients with both the oral and topical NSAIDs without conducting a proper review to avoid therapeutic duplication presenting a risk to the health and safety of the claimants.

373.    An individual who is not a licensed pharmacist is not authorized to perform functions requiring professional judgment, including evaluating prescriptions for drug interactions and counseling patients. 8 N.Y.C.R.R. § 29.7(21)(ii)(b)(2), (6), (7).

374.    Based on M&D's and TTC's delivery receipts, Zagorin, Starchak, and Tabulov delivered drugs, including Topical Pain Products, to claimants off of M&D's and TTC's premises.

375.    For example, certain of these delivery receipts, which are signed or initialed by Zagorin, Starchak, or Tabulov, record a time of delivery outside of M&D's and TTC's reported business hours.

376.    Moreover, as explained above, claimants of the Pharmacy Defendants have testified that the Pharmacy Defendants billed-for medications were delivered to the claimants at the clinics.

377.    Upon information and belief, patients were not personally offered counseling on the issues raised by the prescriptions for both oral and topical NSAIDs, including therapeutic duplication, by a pharmacist or pharmacy intern over the phone or in person before Starchak, Zagorin, or Tabulov delivered the drugs to the patients off of M&D's and TTC's premises.

378.    Starchak, Zagorin, and Tabulov, as non-pharmacists, could not lawfully provide—or even *offer*—the required counseling, which was intended to screen for and protect against potential problems associated with the drugs being dispensed.

379.    The chart below contains examples where, according to M&D's delivery receipts, Zagorin or Starchak, on behalf of M&D, delivered topical and oral NSAIDs to the same patient:

| Claimant | Billed-For Medications | Date Delivered | Prescribing Provider | Delivered By |
|---|---|---|---|---|
| E.L. (0462678277) | Meloxicam 15mg Tab; Diclofenac Sodium 3% Gel; Cyclobenzaprine Hydr 5mg Tab | 4/30/2018 | Mark Gladstein, M.D. | Zagorin |
| M.E. (0546577388) | Cyclobenzaprine Hydr 5mg Tab; Diclofenac Sodium 3% Gel; Naproxen Sodium 550mg Tab | 6/27/2019 | Stephanie Butschek, PA | Zagorin |
| T.B. (0504577636) | Meloxicam 15mg Tab; Diclofenac Sodium 3% Gel | 3/21/2019 | Cristy Perdue, M.D. | Starchak |
| J.J. (0533002993) | Cyclobenzaprine Hydr 5mg Tab; Naproxen Sodium 550mg Tab; Diclofenac Sodium 3% Gel | 6/10/2019 | Stephanie Butschek, PA | Starchak |
| D.C. (0538110909) | Diclofenac Sodium 3% Gel; Cyclobenzaprine Hydr 5mg Tab; Meloxicam 15mg Tab | 6/20/2019 | Cristy Perdue, M.D. | Starchak |
| B.P. (0554418566) | Ibuprofen 800mg Tab; Diclofenac Sodium 3% Gel | 10/7/2019 | Ruben Oganesov, M.D. | Starchak |

380.    The chart below contains examples where, according to TTC's delivery receipts, Tabulov, on behalf of TTC, delivered topical and oral NSAIDs to the same patient:

| Claimant | Billed-For Medications | Date Delivered | Prescribing Provider | Delivered By |
|---|---|---|---|---|
| N.A. (0600671804) | Naproxen Sodium 550mg Tab; Diclofenac Sodium 3% Gel | 1/25/2021 | Arkam Rehman, M.D. | Tabulov |
| A.S. (0579777342) | Celecoxib 200mg Cap; Diclofenac Sodium 3% Gel | 10/1/2020 | Reginald DeRosena, PA | Tabulov |
| B.H. (0590560694) | Naproxen Sodium 550mg Tab; Diclofenac Sodium 3% Gel | 9/29/2020 | Denis Clarke, PA | Tabulov |
| B.Y. (0605854637) | Meloxicam 15mg Tab; Diclofenac Sodium 3% Gel | 12/10/2020 | Yahya Shah, PA | Tabulov |

| C.E. (0571500685) | Cyclobenzaprine HCL 5mg Tab; Naproxen Sodium 550mg Tab; Diclofenac Sodium 3% Gel | 12/5/2019 | Muhammad Zakaria, M.D. | Tabulov |
| C.M. (0585432271) | Naproxen Sodium 550mg Tab; Diclofenac Sodium 3% Gel | 6/24/2020 | Radha Gara, M.D. | Tabulov |

381.    The Defendants and the prescribing providers disregarded patient safety when prescribing, dispensing, and delivering duplicative and medically unnecessary topical medications with oral NSAIDs in furtherance of their scheme to prescribe and bill for as many drugs as possible.

382.    The Defendants violated their duty to patients to identify risks posed by the therapeutic duplication of topical and oral NSAIDs and to provide an offer of appropriate counseling personally from a licensed pharmacist or pharmacy intern over the telephone or in person before the NSAIDs were delivered off of M&D's and TTC's premises.

383.    Based on documentation provided to Allstate, a written offer of counseling was not included with the drugs dispensed off of the Pharmacy Defendants' premises to Allstate claimants.

384.    Thus, the Pharmacy Defendants violated New York law governing pharmacies and the dispensation of prescription drugs when it billed Allstate for duplicative and medically unnecessary topical medications that were purportedly delivered off premises by a non-pharmacist who could not lawfully offer or provide counseling to patients regarding the risks posed by those drugs.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

385.    The Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally

violated the laws of the United States by devising and intending to devise, schemes to defraud and obtain money and property using false and fraudulent pretenses and representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) to execute, or attempt, such fraudulent schemes.

386.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

387.    Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

A.    **M&D ENTERPRISE**

388.    Zagorin, Starchak, and Tabulov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from M&D to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

389.    Zagorin, Starchak, and Tabulov caused M&D to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that M&D mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

390.    Zagorin, Starchak, and Tabulov's participation in the operation and management of M&D, which included, among other things, (a) owning M&D, (b) sharing patients and referral sources with TTC, (c) facilitating unlawful prescriptions between M&D and prescribers, (d) delivering drugs to M&D patients, and/or (e) causing M&D to submit false and fraudulent No-Fault benefit claims to Allstate, rendered M&D completely ineligible for No-Fault reimbursement under New York law.

391.    As a result of the above-described conduct, Zagorin, Starchak, and Tabulov purposely caused M&D to make a misrepresentation every time that M&D mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

392.    Moreover, because (a) Zagorin, Starchak, and Tabulov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of M&D, (b) Zagorin, Starchak, and Tabulov caused M&D to seek No-Fault reimbursement from Allstate (even though M&D was not lawfully entitled to such reimbursement), and (c) M&D used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Zagorin, Starchak, and Tabulov committed mail fraud.

393.    At all relevant times, Zagorin, Starchak, and Tabulov knew that M&D (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) M&D.

394.    Allstate estimates that the unlawful operation of the M&D enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of

this scheme is annexed at Exhibit 5 and incorporated herein by reference as if outlined in its entirety.

**B.    TTC ENTERPRISE**

395.    Zagorin, Starchak, Tabulov, and Girenko either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from TTC to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

396.    Zagorin, Starchak, Tabulov, and Girenko caused TTC to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that TTC mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

397.    Zagorin, Starchak, Tabulov, and Girenko's participation in the operation and management of TTC, which included, among other things, (a) owning TTC, (b) sharing patients and referral sources with M&D, (c) facilitating unlawful prescriptions between TTC and prescribers, (d) delivering drugs to TTC patients, and/or (e) causing TTC to submit false and fraudulent No-Fault benefit claims to Allstate, rendered TTC completely ineligible for No-Fault reimbursement under New York law.

398.    As a result of the above-described conduct, Zagorin, Starchak, Tabulov, and Girenko purposely caused TTC to make a misrepresentation every time that TTC mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

399.    Moreover, because (a) Zagorin, Starchak, Tabulov, and Girenko engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of TTC, (b) Zagorin, Starchak, Tabulov, and Girenko caused TTC to seek No-Fault

reimbursement from Allstate (even though TTC was not lawfully entitled to such reimbursement), and (c) TTC used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Zagorin, Starchak, Tabulov, and Girenko committed mail fraud.

400.    At all relevant times, Zagorin, Starchak, Tabulov, and Girenko knew that TTC (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) TTC.

401.    Allstate estimates that the unlawful operation of the TTC enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated herein by reference as if outlined in its entirety.

C.    **FIRST CLASS ENTERPRISE**

402.    Girenko and Tabulov either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from First Class to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

403.    Girenko and Tabulov caused First Class to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that First Class mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

404.    Girenko and Tabulov's participation in the operation and management of First Class, which included, among other things, (a) owning First Class, (b) facilitating unlawful

prescriptions between First Class and prescribers, (c) delivering drugs to First Class patients, and/or (d) causing First Class to submit false and fraudulent No-Fault benefit claims to Allstate, rendered First Class completely ineligible for No-Fault reimbursement under New York law.

405.     As a result of the above-described conduct, Girenko and Tabulov purposely caused First Class to make a misrepresentation every time that First Class mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

406.     Moreover, because (a) Girenko and Tabulov engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of First Class, (b) Girenko and Tabulov caused First Class to seek No-Fault reimbursement from Allstate (even though First Class was not lawfully entitled to such reimbursement), and (c) First Class used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Girenko and Tabulov committed mail fraud.

407.     At all relevant times, Girenko and Tabulov knew that First Class (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) First Class.

408.     Allstate estimates that the unlawful operation of the First Class enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 7 and incorporated herein by reference as if outlined in its entirety.

## VII.  SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

409.    At all relevant times during the operation of the M&D, TTC, and First Class enterprises, Zagorin, Starchak, Tabulov, and Girenko purposely caused M&D, TTC, and First Class to falsely certify that they were eligible to be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate claimants who were caused to be customers of M&D, TTC, and First Class.

410.    At all relevant times, Zagorin, Starchak, Tabulov, and Girenko directly participated in the operation and management of M&D, TTC, and First Class.

411.    Zagorin, Starchak, Tabulov, and Girenko purposely concealed the lack of medical necessity for the drugs, including Topical Pain Products, to be dispensed and charged by M&D, TTC and First Class.

412.    For instance, as alleged herein, Zagorin, Starchak, Tabulov, and Girenko created and submitted to Allstate (or caused the creation and submission of) letters of medical necessity that falsely attested to the medical necessity of drugs, including Topical Pain Products, that were referred to M&D, TTC, and First Class, and purportedly dispensed and delivered by M&D, TTC, and First Class to an Allstate claimant.

413.    The actions of Zagorin, Starchak, Tabulov, and Girenko were responsible for causing M&D's, TTC's, and First Class's (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d)

dispensing drugs in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by M&D, TTC, and First Class. Zagorin, Starchak, Tabulov, and Girenko caused M&D, TTC, and First Class to falsely claim eligibility for No-Fault reimbursement each and every time they sought No-Fault reimbursement from Allstate.

414. As alleged above, Zagorin, Starchak, Tabulov, and Girenko caused M&D, TTC, and First Class to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

415. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

416. Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

417. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

418. Thus, every time that Zagorin, Starchak, Tabulov, and Girenko caused M&D, TTC, and First Class to submit No-Fault reimbursement demands to Allstate, Zagorin, Starchak,

Tabulov, and Girenko necessarily certified that M&D, TTC, and First Class were eligible to be reimbursed under New York's No-Fault laws.

419.    The full extent of Zagorin, Starchak, Tabulov, and Girenko's fraudulent and unlawful acts relative to their participation in the M&D, TTC, and First Class enterprises was not known to Allstate until shortly before it commenced this action.

## VIII.  ALLSTATE'S JUSTIFIABLE RELIANCE

420.    Each claim submitted to Allstate by M&D, TTC, and First Class was verified according to Insurance Law § 403.

421.    Zagorin, Starchak, Tabulov, and Girenko, as pharmacy owners, were responsible for the proper conduct of M&D, TTC, and First Class in accordance with New York law.

422.    To induce Allstate to promptly pay M&D's, TTC's, and First Class's patient invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 bills certifying that M&D, TTC, and First Class were eligible to be reimbursed under New York's No-Fault Laws.

423.    Further, to induce Allstate to promptly pay the fraudulent charges for prescription drug and other pharmacy services purportedly provided to Allstate claimants, the Defendants hired attorneys to pursue collection of the fraudulent and/or non-compensable charges from Allstate. These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate.

424.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Allstate by (or on behalf of) M&D, TTC, and First Class in support of the fraudulent and/or non-compensable

charges at issue, combined with the material misrepresentations described above, were designed to and did, cause Allstate to justifiably rely on them.

425.    The Defendants concealed from Allstate the truth regarding M&D's, TTC's, and First Class's reimbursement eligibility under New York law.

426.    In reasonable reliance on these misrepresentations, Allstate paid money to M&D, TTC, and First Class to its detriment.

427.    Allstate would not have paid these monies to M&D, TTC, and First Class had the Defendants provided true and accurate information about the fact and necessity of the billed-for drugs, or the existence of fraudulent prescription protocols and unlawful referral arrangements— those facts were material to M&D's, TTC's, and First Class's No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq*.

428.    As a result, Allstate was caused to pay M&D, TTC, and First Class, collectively, over $941,200.00 in reasonable reliance on the Defendants' false No-Fault claim reimbursement documentation and the false representations regarding M&D's, TTC's, and First Class's eligibility for reimbursement under New York's No-Fault Laws.

## IX.    DAMAGES

429.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments in connection with first-party claims in excess of $941,200.00, the exact amount to be determined at trial, including:

a.  Payments made to M&D Elite Pharmacy, LLC in connection with first-party claims in excess of $586,396.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 8, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to M&D Elite Pharmacy, LLC in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

b.  Payments made to Time to Care Pharmacy Inc. in connection with first-party claims in excess of $254,986.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 9, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Time to Care Pharmacy Inc. in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

c.  Payments made to First Class Pharmacy Corp in connection with first-party claims in excess of $99,818.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 10, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to First Class Pharmacy Corp in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### M&D ELITE PHARMACY, LLC ENTERPRISE
### (Against Marat Zagorin, Daniel Starchak, Michael Tabulov, and Time to Care Pharmacy Inc.)

430.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 430 as if set forth fully herein.

431.    In furtherance of their operation and management of M&D Elite Pharmacy, LLC, Defendants Marat Zagorin, Daniel Starchak, Michael Tabulov, and Time to Care Pharmacy Inc. (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

432.    The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

433.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the U.S. Mail.

434.    Policies of insurance were delivered to two or more Allstate claimants through the U.S. Mail.

435.    Payments made by Allstate to M&D Elite Pharmacy, LLC were delivered through the U.S. Mail.

436.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by M&D Elite Pharmacy, LLC to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

437.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to M&D Elite Pharmacy, LLC for the benefit of one or more of the Count I Defendants that would not otherwise have been paid.

438.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count I Defendants to continue this scheme without being detected.

439.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

440.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to M&D Elite Pharmacy, LLC for the benefit of the Count I Defendants.

441.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

442.    M&D Elite Pharmacy, LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

443.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

444.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count I Defendants' conduct.

445.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

446.    Because of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### M&D ELITE PHARMACY, LLC ENTERPRISE
### (Against Marat Zagorin, Daniel Starchak, Michael Tabulov, and Time to Care Pharmacy Inc.)

447.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

448.    Through their participation in the operation and management of M&D Elite Pharmacy, LLC, Defendants Marat Zagorin, Daniel Starchak, Michael Tabulov, and Time to Care Pharmacy Inc. (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

449.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of M&D Elite Pharmacy, LLC through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 5, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

450.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of M&D Elite Pharmacy, LLC, even though M&D Elite Pharmacy, LLC, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

451.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

452.    Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

453.    Because of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained because of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT III</u>
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**TIME TO CARE PHARMACY INC. ENTERPRISE**
**(Against Marat Zagorin, Daniel Starchak, Michael Tabulov, M&D Elite Pharmacy, LLC, Vyacheslav Girenko, and First Class Pharmacy Corp)**

454.   Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

455.    In furtherance of their operation and management of Time to Care Pharmacy Inc., Defendants Marat Zagorin, Daniel Starchak, Michael Tabulov, M&D Elite Pharmacy, LLC, Vyacheslav Girenko, and First Class Pharmacy Corp (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

456.   The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

457.   Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the U.S. Mail.

458.   Policies of insurance were delivered to two or more Allstate claimants through the U.S. Mail.

459.   Payments made by Allstate to Time to Care Pharmacy Inc. were delivered through the U.S. Mail.

460.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by Time to Care Pharmacy Inc. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

461.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to Time to Care Pharmacy Inc. for the benefit of one or more of the Count III Defendants that would not otherwise have been paid.

462.    The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count III Defendants to continue this scheme without being detected.

463.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

464.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Time to Care Pharmacy Inc. for the benefit of the Count III Defendants.

465.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

466.    Time to Care Pharmacy Inc. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

467.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

468.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count III Defendants' conduct.

469.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

470.    Because of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### TIME TO CARE PHARMACY INC. ENTERPRISE
**(Against Marat Zagorin, Daniel Starchak, Michael Tabulov, M&D Elite Pharmacy, LLC, Vyacheslav Girenko, and First Class Pharmacy Corp)**

471.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

472.    Through their participation in the operation and management of Time to Care Pharmacy Inc., Defendants Marat Zagorin, Daniel Starchak, Michael Tabulov, M&D Elite Pharmacy, LLC, Vyacheslav Girenko, and First Class Pharmacy Corp (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

473.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of Time to Care Pharmacy Inc. through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 6, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

474.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Time to Care Pharmacy Inc., even though Time to Care Pharmacy Inc., as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

475.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

476.    Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

477.    Because of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained because of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### FIRST CLASS PHARMACY CORP ENTERPRISE
**(Against Vyacheslav Girenko, Michael Tabulov, and Time to Care Pharmacy Inc.)**

478.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

479.    In furtherance of their operation and management of First Class Pharmacy Corp, Defendants Vyacheslav Girenko, Michael Tabulov, and Time to Care Pharmacy Inc. (collectively, "Count V Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

480.    The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

481.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the U.S. Mail.

482.    Policies of insurance were delivered to two or more Allstate claimants through the U.S. Mail.

483.    Payments made by Allstate to First Class Pharmacy Corp were delivered through the U.S. Mail.

484.    As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by First Class Pharmacy Corp to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

485.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and

employees, issued drafts to First Class Pharmacy Corp for the benefit of one or more of the Count V Defendants that would not otherwise have been paid.

486.    The Count V Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count V Defendants to continue this scheme without being detected.

487.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

488.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to First Class Pharmacy Corp for the benefit of the Count V Defendants.

489.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

490.    First Class Pharmacy Corp constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

491.    The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

492.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count V Defendants' conduct.

493.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

494.    Because of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### FIRST CLASS PHARMACY CORP ENTERPRISE
### (Against Vyacheslav Girenko, Michael Tabulov, and Time to Care Pharmacy Inc.)

495.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

496.    Through their participation in the operation and management of First Class Pharmacy Corp, Defendants Vyacheslav Girenko, Michael Tabulov, and Time to Care Pharmacy Inc. (collectively, "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

497.    The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of First Class Pharmacy Corp through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

498.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of First Class Pharmacy Corp, even though First Class Pharmacy Corp, as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

111

499.    The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

500.    Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Defendants' unlawful conduct described herein.

501.    Because of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified three times the damages sustained because of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## COMMON LAW FRAUD
### (Against All Defendants)

502.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

503.    The Defendants schemed to defraud Allstate by, among other things, (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for

medically unnecessary drugs that were to be filled exclusively by M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp.

504.    The Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp's eligibility for and entitlement to No-Fault reimbursement under New York law.

505.    The misrepresentations of fact by the Defendants included, but were not limited to, material misrepresentations of fact made in M&D Elite Pharmacy, LLC's, Time to Care Pharmacy Inc.'s, and First Class Pharmacy Corp's NF-3 forms, prescription forms, patient treatment records, delivery receipts, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or payment requests.

506.    The Defendants' representations were false or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

507.    The misrepresentations were intentionally made by the Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp demanding payment of No-Fault insurance benefits.

508.    The Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate claimants were false, and were made to induce Allstate to make payments for claims that were not legitimate or lawfully compensable.

509.    Allstate reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning M&D Elite Pharmacy, LLC's, Time to Care Pharmacy Inc.'s, and First Class Pharmacy Corp's eligibility to receive No-Fault reimbursement in paying numerous

bills for prescription drugs and other pharmacy expenses according to New York's No-Fault insurance laws.

510.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp—totaling more than $941,200.00—for prescription drug and other pharmacy expenses and services rendered to Allstate claimants, even though M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp were, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT VIII
## UNJUST ENRICHMENT
### (Against All Defendants)

511.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 430 as if fully set forth herein.

512.    As alleged herein, the Defendants, through various means, conspired to induce Allstate to make numerous and substantial payments to M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp in connection with claims made under New York's No-Fault Laws.

513.    When Allstate paid M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made (or were caused to make) concerning M&D Elite Pharmacy, LLC's, Time to Care Pharmacy Inc.'s, and First Class Pharmacy Corp's reimbursement eligibility under New York's No-Fault Laws.

514.    Every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp, during this scheme constitutes a benefit that the Defendants aggressively caused M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp to seek and voluntarily accept.

515.    Throughout their scheme, the Defendants caused M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp to wrongfully obtain a multitude of payments from Allstate—totaling over $941,200.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

516.    Under New York law, the Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims submitted by (or on behalf of) the Defendants because M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp (a) billed Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate claimants' purported injuries, (b) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charged Allstate for drugs at grossly excessive rates, (d) dispensed drugs in violation of applicable regulatory and licensing requirements, and/or (e) maintained unlawful relationships with prescribers and induced them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp.

517.    As a direct and proximate result of this unlawful conduct relating to the billing for fraudulent, unnecessary, and ineffective drugs with respect to Allstate claimants, at no point were

M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., or First Class Pharmacy Corp ever eligible for reimbursement under New York's No-Fault Laws.

518. Throughout this scheme, the Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp.

519. Retention of those benefits by any of the Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT IX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against M&D Elite Pharmacy, LLC)**

520. Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 430 as if set forth fully herein.

521. To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

522. In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by M&D Elite Pharmacy, LLC, M&D Elite Pharmacy, LLC was, at all relevant

times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

523.    M&D Elite Pharmacy, LLC continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

524.    M&D Elite Pharmacy, LLC continues to challenge Allstate's prior claim denials.

525.    M&D Elite Pharmacy, LLC continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

526.    A justifiable controversy exists between Allstate and M&D Elite Pharmacy, LLC because M&D Elite Pharmacy, LLC rejects Allstate's ability to deny such claims.

527.    Allstate has no adequate remedy at law.

528.    M&D Elite Pharmacy, LLC also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by M&D Elite Pharmacy, LLC.

529.    Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that M&D Elite Pharmacy, LLC has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, M&D Elite Pharmacy, LLC.

## COUNT X
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Time to Care Pharmacy Inc.)

530.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 430 as if set forth fully herein.

531.    To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

532.    In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by Time to Care Pharmacy Inc., Time to Care Pharmacy Inc. was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

533.    Time to Care Pharmacy Inc. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

534.    Time to Care Pharmacy Inc. continues to challenge Allstate's prior claim denials.

535.    Time to Care Pharmacy Inc. continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

536.    A justifiable controversy exists between Allstate and Time to Care Pharmacy Inc. because Time to Care Pharmacy Inc. rejects Allstate's ability to deny such claims.

537.    Allstate has no adequate remedy at law.

538.    Time to Care Pharmacy Inc. also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by Time to Care Pharmacy Inc.

539.    Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that Time to Care Pharmacy Inc. has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, Time to Care Pharmacy Inc.

## COUNT XI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against First Class Pharmacy Corp)

540.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 430 as if set forth fully herein.

541.    To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

542.    In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable

under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled exclusively by First Class Pharmacy Corp, First Class Pharmacy Corp was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

543.    First Class Pharmacy Corp continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

544.    First Class Pharmacy Corp continues to challenge Allstate's prior claim denials.

545.    First Class Pharmacy Corp continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

546.    A justifiable controversy exists between Allstate and First Class Pharmacy Corp because First Class Pharmacy Corp rejects Allstate's ability to deny such claims.

547.    Allstate has no adequate remedy at law.

548.    First Class Pharmacy Corp also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by First Class Pharmacy Corp.

549.    Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that First Class Pharmacy Corp has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault

benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, First Class Pharmacy Corp.

## XI.    DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**M&D ELITE PHARMACY, LLC ENTERPRISE**
**(Against Marat Zagorin, Daniel Starchak, Michael Tabulov, and Time to Care Pharmacy Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**M&D ELITE PHARMACY, LLC ENTERPRISE**
**(Against Marat Zagorin, Daniel Starchak, Michael Tabulov, and Time to Care Pharmacy Inc.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### TIME TO CARE PHARMACY INC. ENTERPRISE
**(Against Marat Zagorin, Daniel Starchak, Michael Tabulov, M&D Elite Pharmacy, LLC, Vyacheslav Girenko, and First Class Pharmacy Corp)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### TIME TO CARE PHARMACY INC. ENTERPRISE
**(Against Marat Zagorin, Daniel Starchak, Michael Tabulov, M&D Elite Pharmacy, LLC, Vyacheslav Girenko, and First Class Pharmacy Corp)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### FIRST CLASS PHARMCY CORP ENTERPRISE
### (Against Vyacheslav Girenko, Michael Tabulov, and Time to Care Pharmacy Inc.)

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count V Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### FIRST CLASS PHARMACY CORP ENTERPRISE
### (Against Vyacheslav Girenko, Michael Tabulov, and Time to Care Pharmacy Inc.)

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c) GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
### COMMON LAW FRAUD
### (Against All Defendants)

(a) AWARD Allstate's actual damages in an amount to be determined at trial; and

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by M&D Elite Pharmacy, LLC, Time to Care Pharmacy Inc., and First Class Pharmacy Corp seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a) AWARD Allstate's actual and consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

**COUNT IX**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against M&D Elite Pharmacy, LLC)**

(a) DECLARE that M&D Elite Pharmacy, LLC, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering M&D Elite Pharmacy, LLC completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that M&D Elite Pharmacy, LLC's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by M&D Elite Pharmacy, LLC; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT X**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Time to Care Pharmacy Inc.)**

(a) DECLARE that Time to Care Pharmacy Inc., at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering Time to Care Pharmacy Inc. completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

124

(b) DECLARE that Time to Care Pharmacy Inc.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by Time to Care Pharmacy Inc.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against First Class Pharmacy Corp)

(a) DECLARE that First Class Pharmacy Corp, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering First Class Pharmacy Corp completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b) DECLARE that First Class Pharmacy Corp's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied, and/or future No-Fault insurance claims submitted by First Class Pharmacy Corp; and

(d) GRANT all other relief this Court deems just and appropriate.

## XII.   JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Michael W. Whitcher*

_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Michael W. Whitcher (MW 7455)
mwhitcher@ktmpc.com
100 Ring Road, Suite 211
Garden City, NY 11530
Ph: 347-710-0050
Fax: 347-710-0055

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Fire & Casualty Insurance Company*

Dated:  March 19, 2025